BRAY v. MILES, EXECUTOR, ET AL.

[No. 2,767.    Filed June 30, 1899.    Rehearing denied Nov. 29, 1899.

WILLS.—*Construction.*— *Parent and Child.*— *Adoption.* — Under a clause in a will giving property to three sons and a daughter of testator, and providing that in the event of the death of either of the four "the shares due such as may be deceased shall go to the children of such deceased person, if there be children, and if there be no children, then such share shall go to the survivors," upon the death of the daughter before the bequest became operative, without issue, her adopted child was entitled to take her share by the provision of §826 Horner 1897 that the adoptive parents shall occupy the same position to an adopted child as natural parents.    Wiley, J., dissenting.

From the Hendricks Circuit Court.    *Reversed.*

G. W. Brill, G. C. Harvey, R. W. McBride and C. S. Denny, for appellant.

E. G. Hogate, J. L. Clark, T. J. Cofer and R. T. Hollowell, for appellees.

COMSTOCK, C. J.—The questions submitted to the court in this case involve the construction of the statute of this

State, concerning the adoption of heirs, and the application of that statute to the will of John Miles, who died testate, at Hendricks county, Indiana, June 23, 1896, and whose will was duly probated in that county. In order to present the question, we quote three items from the will, a copy of which is set out in the record:

"(2) I will, give, and bequeath to my two sons, Thomas J. Miles and John A. Miles, in trust, all my personal estate, including money on hand and due me from every source, the same to be safely and prudently used and invested so as to yield an income; and from said personal estate and the income therefrom I desire and direct that my wife, Elizabeth Miles, and my two invalid daughters, to wit, Emily Miles and Jane Miles, shall be provided with a comfortable maintenance and support in sickness and in health, and a comfortable and suitable home so long as they or any of them shall live; and in the event that for any cause my sons above named fail to execute this clause of my will, I direct that the Hendricks Circuit Court shall appoint some competent and suitable person who shall fully execute this trust, and shall give bond for the faithful performance of his duties in relation thereto. In the performance of the duties imposed by this provision of my will, I hereby authorize my said sons, Thomas J. Miles and John Miles, or whomsoever may act in their stead as aforesaid, to dispose of my salable personal property at such time and in such manner as will in their judgment best subserve the purpose hereinbefore specified, but such executors shall make a complete inventory of said personal estate, as required by law, to be filed with the clerk of the Hendricks Circuit Court, and shall report to said court at least once in every two years a true and complete account of all money received and paid out by them; and said executors shall be allowed fair and reasonable compensation for their services, to be allowed and approved by said court.

"(11) It is my will, and I hereby expressly declare it to

be the first object of this will, that my said wife, Elizabeth Miles, and my two invalid daughters aforesaid, Emily Miles and Jane Miles, shall be fully and comfortably provided and supplied with all the necessaries and ordinary comforts of life, including a comfortable home, and that my wife shall keep and retain in her possession all such household goods as they may need, and if my personal estate shall not be sufficient to so maintain them so long as they or any of them shall live, then, and in such case, they or any of them, shall have and hold a lien upon all of the real estate which is hereby devised to my children.

"(12) I hereby will and direct that all of the surplus of my estate, after the execution of the several items and clauses of this will above mentioned, shall be distributed among my several children, Martha, Thomas J., John A., and Samuel W. Miles, so as to make them equal in the distribution thereof, and in the event of the death of any one of the last above named the shares due such as may be deceased shall go to the children of such deceased person, if there be children; and if there be no children, then such share shall go to the survivors."

The testator survived his wife. All of the children named in the clauses above quoted survived the maker of the will, but the two invalid daughters are now dead. The daughter Martha, who is named in item twelve of the will, is also dead. The testator's three sons, Thomas J., John A. and Samuel W. are living, and have wives and children living. Martha was, when the will was made, and when she died, a married woman, the wife of one Columbus Walker, but never bore any children. During the lifetime of John Miles, the maker of the will, she, with the knowledge of the testator, adopted the appellant, the adoption having been duly and regularly made under and by virtue of the statutes of this State, concerning the adoption of heirs. The appellant, as such adopted daughter, claims that she is in law the child of and is entitled to the share of her adopted mother, under item

twelve of the will.  Martha was born January 14, 1841, became the wife of Columbus Walker, named in the will, on October 27, 1870, and was his wife at the time of her death on December 2, 1891.  At the time of the marriage she was twenty-nine years old.  She had been married thirteen years when the will was made.  Thomas J. Miles, the only one of the executors named in the will who seems to have acted, filed a final report, showing the death of the widow and the two invalid daughters, claiming that he had fully acquitted himself of the trust created in their behalf by the will, and that there remained for distribution under item twelve of the will $40,663.83, which was represented by notes and bank stock.  He further showed the death of his sister Martha; that she had borne no children, but had adopted the appellant, who survived her; that he and his two brothers named in item twelve of the will, with said Martha, as residuary legatees, having concluded that their sister's adopted daughter was not her child, and that she was not entitled to share in the distribution of said sum, had agreed upon a division of the same among themselves, which they asked the court to approve and confirm, ignoring the appellant as having no right to share in the distribution.  The appellant filed exceptions to this report, showing the fact, the time, and the manner of her adoption, and asking that she be allowed to share in the distribution.  The court, upon the motion of the executor, struck out her exceptions.  This ruling is assigned as one of the errors.  Thereupon the appellant filed her petition for distribution.  When the final report of the executor and the petition for distribution were submitted to the court for hearing, the court was requested by the parties to make a special finding of the facts, and state its conclusions of law thereon, and did so.  The appellant excepted to the conclusions of law, which were adverse to her.  If the appellant, as the adopted child of Martha Walker, is entitled to take the share of her adoptive mother, the action of the trial court was erroneous and the case should be reversed.

Appellant claims that by virtue of her adoption, and in law, and in everything which concerns her property rights, she is the child of Martha Walker. That Martha Walker being dead when the time came for the distribution of the surplus under item twelve of the will, the appellant as such child was entitled to the distributive share which would have gone to her adoptive mother if she were then living.

The will designates a class, children, as beneficiaries. The question presented, therefore, is whether under the statute appellant is a child of Martha, the daughter of the testator. Can she be identified as a beneficiary named in the will? It is conceded that she cannot take by inheritance from the decedent. Adoption has been defined to be "the act by which a person appoints as his heir the child of another. *Abney v. DeLoach*, 84 Ala. 393, 4 South. 557. The object of adoption is to place as nearly as possible the child adopted in the place of a natural one; to give it the position in the family as the child both of the husband and wife, conferring on it rights and privileges of a child. Among other consequences, the effect of adoption is to cast succession upon the adopted in case of the intestacy of the adopting father. Adoption was unknown to the common law. It was regulated by law in Greece and Rome. In Rome the system was in vogue before the time of Justinian. He reduced the system, which prior to his time was encumbered with formal ceremonies, to a code which simplified the proceeding, and from which modern legislation upon the subject has derived its chief features, adapting them to our wants. It was introduced as a part of the civil law in this country from France and Spain respectively to Louisiana and Texas. For the reason that it is purely statutory and in derogation of the common law, it has frequently been said that it is to be strictly construed. This expression occurs in the reported cases in which the jurisdiction of the officer or tribunal or the regularity of the proceedings of adoption have been called in question. The statute is not to be so strictly construed as to

defeat its purposes. §838 Burns 1894, §826 Horner 1897, reads: "After the adoption of such child, such adopted father or mother shall occupy the same position toward such child that he or she would if the natural father òr mòther, and be liable for the maintenance, education and every other way responsible as a natural father or mother." The name of the child is changed; its identity is lost in that of the adopting parents; it becomes in all but blood their child.

In *Martin* v. *Aetna Ins. Co.*, 73 Me. 25, it was held that an adopted child falls within the terms "children" when there is no other person that answers that description.

In 5 Am. & Eng. Ency. of Law, p. 1098, it is stated that the words "child" or "children" usually include an adopted child, citing *Power* v. *Hafley*, 85 Ky. 671, 4 S. W. 683; *Stanley* v. *Chandler*, 53 Vt. 624; *Keegan* v. *Geraghty*, 101 Ill. 40.

In *Clifton* v. *Goodbun*, L. R. 6 Eq. 277, the word "children," in the will of a bachelor was held to mean illegitimate children, as he could have no other.

In *Vidal* v. *Commagere*, 13 La. Ann. 516, the court held, under a statute which allowed a married couple to adopt an orphan child, that when adopted the child became to all intents and purposes the child of the adopting couple. The court said: "We conclude, therefore, that, as by the common acceptation of the word adoption, the relationship of parent and child with all the consequences of that relationship is understood, as such was the legal meaning of the word under the former laws of Louisiana, and as such is its acceptation among civilians and those conversant with the sources of our laws, we cannot say that the legislature used the word in a more restrained sense; in a sense not understood in common parlance, not given in any dictionary, and not known in any system of laws. As by the former laws of Louisiana, the person adopted bore the relation of child to the person adopting, and inherited his estate, so we think the legislature, by the solemn expression of its will, intended

to confer the same right upon the plaintiff to the estate of those who were authorized to adopt her."

In *Estate of Wardell*, 57 Cal. 484, in construing the word "children" in the statute of descent, the court says, it "must relate to *status*, not to origin—to the capacity to inherit * * * its meaning includes all children upon whom has been conferred by law the capacity of inheritance." In this case, a woman's will was set aside because it made no provision for an illegitimate daughter, the statute providing that "When any testator omits to provide in his will for any of his children, or for the issue of any deceased child, unless it appears that such omission was intentional, such child, or the issue of such child, must have the same share in the estate of the testator as if he had died intestate."

In *Power* v. *Hafley*, *supra*, the court, in discussing numerous cases upon the subject of adoption, said: "When the statute authorizes a full and complete adoption, the child adopted thereunder acquires all of the legal rights and capacities, including that of inheritance, of a natural child, and is under the same duties."

The Supreme Court of this State has construed the statute in the following and other cases: *Barnes* v. *Allen*, 25 Ind. 222; *Markover* v. *Krauss*, 132 Ind. 294, 17 L. R. A. 806; *Humphries* v. *Davis*, 100 Ind. 274, 50 Am. Rep. 788; *Krug* v. *Davis*, 87 Ind. 590; *Davis* v. *Krug*, 95 Ind. 1; *Humphries* v. *Davis*, 100 Ind. 369; *Paul* v. *Davis*, 100 Ind. 422; *Isenhour* v. *Isenhour*, 52 Ind. 328; *Keith* v. *Ault*, 144 Ind. 626; *Patterson* v. *Browning*, 146 Ind. 160.

In *Markover* v. *Krauss*, *supra*, the court said: " 'He who is either adopted or arrogated is assimilated in many points to a son born in lawful matrimony.' * * * Adoptive children, so long as they are held in adoption, are in the position of children born to us. * * * The adopted child, while held in the bonds of adoption, was still in the position of a natural child, or a child born to the adopting father. Not, as is said in *Humphries* v. *Davis*, *supra*,

Bray v. Miles.

that the law contemplated to do the work of nature and create a child of one's blood out of a stranger, but, that the law could, and did make the legal status of the one in every respect that of the other. Thus, the son of the adopted son was by the law made the grandson of the adopting father, with all the legal rights incident to that relation." After quoting from *Vidal* v. *Commagere, supra,* the court says: "Viewing this statute in the light of the civil law, it seems clear to us that the legislative intention was to give to adopted children the same relation to adopted parents that was given them by the civil law; that, in so far as property rights are concerned, it was the intention to give to them the same rights as if they were their natural children, or children of their blood; and, when the adoption is joint, that they should, as to all property rights, be, in the eye of the law, *children of the adoptive father by the adoptive mother.*" The court in the same case declined to consider a construction of the statute which would favor natural as against adopted children in the following language: "If, however, they are all adopted children, under the construction contended for by the appellant, the widow will take one-third in fee, thus excluding them from all participation in that portion of the estate. The effect of such a construction would be to discriminate in favor of natural and against adopted children, and, in the face of the plain, unequivocal language of the statute, and of the established rules of the civil law, to deny to adopted children the equal rights said to be theirs by virtue of their adoption."

In *Barnes* v. *Allen, supra,* the court said: "Under §3 of the 'act regulating the adoption of heirs' *supra,* they were the heirs of the adopting father, in the degree of children."

In *Krug* v. *Davis, supra,* the court said: "The obvious purpose of the statute before us was to authorize the incorporation of the children of other persons into families desirous of assuming control over them, and in that way to sanction the formation of new and artificial family relations between

persons not necessarily of the same blood. It evidently contemplates that persons desirous of adopting children under it shall be of suitable age to enter into parental relations, but as to such persons it applies as well to those who are married as to those who are unmarried. It would be inconsistent with the general scope and purpose of this statute to permit two or more persons representing different families to jointly or concurrently adopt the same child, but that objection, in our estimation, does not apply to joint proceedings by husband and wife for the adoption of a child. On the contrary, the better and more reasonable construction appears to us to be that a wife may unite with her husband in such a proceeding as, from the very nature of things, the interests of the entire family are necessarily involved in the object sought to be accomplished by it. There is not only no inconsistency, but a manifest propriety, in the wife thus uniting with her husband, as, by doing so, the adopted child is made to assume, in a general sense, the same position in the family which it would occupy if it were the natural child of both, born in lawful wedlock. * * *.

"It is clear to us that the leading and controlling purpose of the framers of the statute under examination was to place an adopted child as nearly as possible in the place of a natural one; to give it a position in the family as the child both of the husband and wife. In a matter which so nearly concerns the interests of the wife and so deeply affects the welfare of the child, it is eminently proper that the husband and wife should unite in making the child their own. * * *

"The purpose which the statute we are examining was intended to accomplish was to enable parents to adopt as their own the children of others, and to secure for the adopted child the parental affection of both a father and a mother. As the adopted child of both the husband and wife, it would stand much more nearly in the place of a natural child than if it was made the child of only one of them by adoption, and this was where the legislature meant it should stand. * * *.

"The effect of our decision is to place a child adopted by a husband and wife jointly in substantially the same position as that of a natural child, and when the child takes this place there are long settled rules which will determine and control the rights of all the interested parties, and there is then neither confusion nor uncertainty."

In *Humphries* v. *Davis*, 100 Ind. 274, the court said: "If, as the civil law so fully provided, a child of the adoptive son stood in the relation of grandchild to the adoptive father, then the son himself must stand as the child of that father."

From the case of *Paul* v. *Davis*, 100 Ind. 422, we quote the following: "The adoptive child does become the stirps or stock of inheritance, but to whom does it sustain this relation as to property acquired by inheritance from the adoptive parents? Doubtless, this relation exists between such a child and its children; they are of the original stock of descent, for they bear the relation of grandchildren to the adoptive parents. The legal relation does not end with the death of the adoptive child, and so the line of descent goes back, in default of wife or children, to the source from which the property came. * * *.

"In the earlier case of *Barnes* v. *Allen*, 25 Ind. 222, it is clearly implied that the relation between the adoptive parent and the adoptive child is that of parent and child, with the reciprocal right of inheritance."

The case of *Markover* v. *Krauss*, 132 Ind. 294, has been cited and approved, in *Keith* v. *Ault*, 144 Ind. 626, and in *Patterson* v. *Browning*, 146 Ind. 160. In the former, at page 628, the court says: "It is not questioned that by the statute for the adoption of heirs, already cited, the appellant was 'entitled to receive all the rights and interest in the estate' of her adoptive father that she would have received if she had been his natural child. As a matter of fact, her rights as the child of James H. Lemmon were fully recognized in the partition of his real estate, a child's full part

being set off to her, subject, as in the case of other children, to the payment of her father's debts. * * * No doubt, if Georgiana had been adopted by both Mr. and Mrs. Lemmon she would have inherited from Mrs. Lemmon as any other child from its parents."

In *Patterson* v. *Browning*, 146 Ind. 160, there was a controversy between natural children and an adopted child. James C. Inwood adopted one Bessie Miffel as his child, her name being changed at the time to Bessie Inwood. At the time of the adoption he had four natural children. He died seized in fee simple of certain real estate, leaving as his heirs the four natural children, the adopted child, and a childless second wife. The wife took under the statute the one-third of his real estate. She afterwards married one Browning, who adopted the said Bessie Inwood, and her name was changed to Bessie Browning. The widow died, and the natural children of Inwood claimed the one-third of their father's estate which the widow had taken descended to them to the exclusion of the adopted daughter. The court said: "Upon this state of facts the appellants claim that the real estate in controversy descended to them as the forced heirs of said widow to the exclusion of all others, and especially to the exclusion of the appellee." The court reached the conclusion that the adopted child was entitled to inherit as a natural child.

Counsel for appellee insist that while the statute of this State fixes the status of the adoptive parent and the adopted child to be that of parent and child under adjudicated cases of our courts, that it by no means follows that they occupy the same relation to each other as to descent of property as a natural parent and child. The following distinctions are pointed out in the status of the adopted and natural child. The parent of a natural child who dies without issue in this State inherits the property of such child regardless of the source from which it was acquired. The adoptive parent only inherits such property as has come to the adopted child

through the adopting parent, while all other property of such adopted child is inherited by his natural kinsmen. *Humphries v. Davis*, 100 Ind. 274; *Davis v. Fogle*, 124 Ind. 41, 7 L. R. A. 485. Where a natural child is born after the execution of a will, without provision being made in the will for such child, such fact revokes the will; while the adoption of a child after the execution of a will making no provision for such child does not have that effect. An adopted child inherits from its natural parents, but not from the relatives of the adopting parent. Citing *Davis v. Fogle, supra; Humphries v. Davis, supra.* Appellant's learned counsel cite *Keegan v. Geraghty*, 101 Ill. 26; *Miller v. Rappley*, 163 Ill. 22; *In re Jessup's Estate*, 81 Cal. 408, 21 Pac. 976, and 22 Pac. 742, 6 L. R. A. 594, in support of the proposition that an heir is a creature of the law, and so far as the adopted child is concerned, a creation of statutory law, and we recognize the correctness of the position. Appellee cites numerous authorties holding that the adopted child does not become the child in fact of the parents making the adoption, and that the statutes upon this subject have generally attempted to fix only the status of the adopted child as to his rights to inherit by descent from them, and that the general rule is that an adopted child cannot take by descent from the ancestors of the adopting parents. The following are the cases cited to sustain appellees' claim. 24th Am. Eng. Ency. of Law, 424; *Meader v. Archer*, 65 N. H. 214, 23 Atl. 521; *Sunderland's Estate*, 60 Iowa 732, 13 N. W. 655; *Keegan v. Geraghty, supra; Davis v. Fogle, supra; Wyeth v. Stone*, 144 Mass. 441, 11 N. E. 729; *Barnhizel v. Ferrell*, 47 Ind. 335; *Russell v. Russell*, 84 Ala. 48, 3 South. 900; *Schafer v. Eneu*, 54 Pa. St. 304; *Barnes v. Allen*, 25 Ind. 222. But, as contended by appellant, and as we conceive the question to be, the property rights of children as an abstract proposition are not involved in this appeal. The question is one of the identification of a legatee. By the terms of the will, as we have

seen, in the event of the death of any of the four children named in item twelve, the shares of those deceased shall go to their children, "if there be children, and if there be no children, then such shares shall go to the survivors." When the will became operative, Martha was dead, leaving appellant, an adopted child, surviving her. Her rights of inheritance are not material because she is claiming nothing as an inheritance. Her claim is based solely on the will and the statute which makes her, as the adopted child of Martha a legatee, because she is, under the law, the child of Martha, and, irrespective of any right of inheritance, a legatee. Had Martha left a natural and an adopted child, we think there could be no question but that both would have taken equally as legatees. In such case appellant would have taken only by virtue of the status given her by the adoption. She is none the less the child because Martha left no child of her body. The testator could have named his legatees "children of her body," "children born to her," "children of her blood," or, "to her issue," or to the "heirs of her body," or by the use of "apt words" could have excluded the adopted child.

The case of *Davis* v. *Fogle, supra,* cited by appellees, involved the construction of §2730 Burns 1894, providing that "if after the making of a will, the testator shall have born to him legitimate issue, who shall survive him, * * * the will will be deemed revoked." The court decided that an adopted child was not a child born to the parent adopting it. The will in question did not provide that in case of the death of any of the children named, the share of the deceased should go to his "legitimate issue," provided he had legitimate issue born to him who should survive him. Appellees strongly rely upon the case of the *New York Life Ins. Co.* v. *Viele,* 22 App. Div. 80, 47 N. Y. Supp. 841. The facts in that case showed that the testatrix, Mary Griffin, removed from America to Saxony, in the year 1855. She executed a will August 6, 1878, in which, after making several speci-

fied bequests in the first clause of the will, by the second clause the testatrix gave all the residue of her estate to her executors in trust; and by the third clause, the executors were directed to invest one-third part of the residuary estate and to apply the net income derived therefrom to the use of her daughter, Emily S. Lengnick, during her lifetime, and upon her decease, the testatrix directed "that the principal of such share be paid over or transferred by my executors to her then 'living lawful issue,' if any, and, if she leave her surviving no such issue, I direct that the same shall then be added in equal parts or proportions to the principal of the several shares of my residuary estate, hereinafter directed to be held in trust for my ten grandchildren, hereinafter named."

The testatrix died at Dresden, Saxony, March 9, 1888, where she had resided for many years. Her daughter Emily was married to Major Lengnick, a citizen of Saxony. Mrs. Lengnick had had two children, both of whom died in 1872. She continued to reside at Dresden, until her death in 1893, having had no children except the two who had died in 1872. At the time of the making of the will, Mrs. Lengnick was about forty years old, and living with her husband at Dresden, but was in poor health. In the year 1873, one year after the death of her two natural children, and about five years before the execution of the will in question, Mrs. Lengnick and her husband adopted, under the laws of the Kingdom of Saxony, a niece of the husband, Olga Felicate Lengnick, who it is conceded was legally adopted under the provision of the Saxony law, and without any limitation in the contract of adoption against her right to inherit. And she insisted as the adopted daughter of Mrs. Lengnick she was the lawful issue of Mrs. Lengnick, and as such was entitled to the trust estate that was created by the third clause of the will. The court held that it was clear that the testatrix did not intend that this share of her estate, given to her daughter Emily for life, should, upon her death, go to

this adopted child. The case is not in point. The adopted child could not take under the will in question, because the beneficiary was described as "the living lawful issue", a description which could not apply to an adopted child. The bequest over was to the living lawful issue of the primary legatee, Emily Lengnick, who died leaving no child except an adopted daughter. The adopted child was not the issue of the primary legatee, nor was issue synonymous with children. One's issue is necessarily one's child, but a child in law is not necessarily one's issue. The legal status of parent and child may exist between those not of the same blood; a status created by statute. Thus in *Patterson* v. *Browning*, 146 Ind. 160, the court says, in effect, that when the legislature uses the word children, without qualification, that the word is broad enough in its significance to include adopted with natural children. It does no violence to the rules of construction to place the same construction upon the word when it occurs in last wills. Counsel for appellee refer to the well settled rule that in every case in which a will is to be construed, the chief object is to ascertain from the language used in the will itself, considering the circumstances surrounding the testator and the objects of his bounty at the time of making the will, the intention and design of the testator. Appellees contend that there is nothing in the will itself, or the circumstances surrounding the testator at the time it was made, that tends in the remotest degree to indicate an intention upon the part of the testator that appellant should participate in the bequest in question. An examination of the will, together with the circumstances surrounding the testator at the time the will was made, as shown by the finding of the court, reveals the fact that John Miles, during his lifetime, had accumulated a large estate; that he had kept the whole of it in his own right and under his own control until his death; that he pledged every dollar of his large estate for the comfortable maintenance and support of his wife and two

invalid daughters. That he had three sons, and but one daughter, Martha, besides those that were invalids. That he gave all of his property, after making provision for his wife and invalid daughters, to these three sons and his daughter Martha. That his said daughter Martha, at the time of making the will, was more than forty-two years of age, and had been married nearly thirteen years; that she had never had any children born to her; that the land he gave to his three sons he gave them in fee simple. That he gave an equal amount to his daughter Martha, during the life of herself and husband, which after death of both of them was given to his heirs at law. That they were not to sell the timber off of said land. It is claimed that these facts show that John Miles, at the time the will was made, believed his daughter would die without issue; because, believing thus, he provided that the real estate given his daughter Martha, at her death and the death of her husband should go to his other heirs; that there was a fixed purpose in his mind to keep his property in the line of his own blood.

It must be further remembered that the meaning of a last will is to be ascertained first from its language, when free from ambiguity. The testator knew of the adoption of the appellant nearly eighteen months prior to his death. It is the theory of appellees that he believed that no children would be born to Martha. Had he designed to exclude her from the participation in his estate, the time and opportunity were ample to have made that purpose known. The will bears evidence of the skill and learning possessed by the attorney drafting it, inconsistent with the theory that apt words were omitted from lack of either. The testator died with the knowledge that appellant, in law, though not in fact, was the child of Martha, and that a portion of the residuum of his estate would go to the children of Martha upon her death. He must be presumed in using the word "children" with no other designation to have so used that word in view of the statute and its interpretation by the Supreme Court.

*Johnson's Appeal*, 88 Pa. St. 346; *Rowan's Est.*, 132 Pa. St. 299, 19 Atl. 82. It must be presumed that he knew a child adopted under the statute was described as the child of the adopting parent, and that the Supreme Court in interpreting the statute had declared that an adopted child was the child of the adopting parent. Under the statute and the decisions appellant answers the description of and is identified as a beneficiary under the will. The court erred in its conclusions of law. The judgment is reversed, with instructions to restate the conclusions and render judgment in accordance with this opinion.

## DISSENTING OPINION.

WILEY, J.—I am unable to concur in the conclusions reached as announced in the prevailing opinion. To sustain that conclusion, a construction must be given to the will of John Miles, which, in my judgment, is so foreign to the manifest intention of the testator, as expressed by the entire will, that violence is done to such intention and object of the testator, and his estate, in part at least, is diverted from the purpose and channel plainly expressed. To hold that appellant, under subdivision twelve of the will, is entitled to share that part of the residue of the estate which Martha Walker, the daughter of the testator, would be entitled to share if she were living, is to hold that it was the manifest intention of the testator by that provision to give to her (appellant), who was alien blood to him, an entire stranger, in fact, not in legal existence at the time the will was made, and within its meaning, an equal share of his estate.

It seems to me that the crucial test in the construction of wills—the primary and universal rule of construction, to wit, that the intention of the testator must prevail, has been entirely overlooked by my associates in the prevailing opinion. It is fundamental in the construction of a will that the intention of the testator must prevail, and in arriving at that

intention, courts in giving an interpretation may place them-
selves in the situation of the testator, examine the surround-
ings, and then from the language used arrive at his intention.
*Corey* v. *Springer*, 138 Ind. 506; *Jackson* v. *Hoover*, 26
Ind. 511; *Price* v. *Price*, 89 Ind. 90; *Hartwig* v. *Schiefer*,
147 Ind. 64. Another familiar rule of construction is that,
if there is any doubt as to the meaning of any clause or por-
tion of a will, it will be construed as a whole. *Kilgore* v.
*Kilgore*, 127 Ind. 276; *Eubank* v. *Smiley*, 130 Ind. 393;
*Nading* v. *Elliott*, 137 Ind. 261; *Moore* v. *Gary*, 149 Ind.
51; *Kelly* v. *Stinson*, 8 Blackf. 387; *Baker* v. *Riley*, 16
Ind. 479; *Jackson* v. *Hoover*, *supra*; *Critchell* v. *Brown*,
72 Ind. 539; *Schori* v. *Stephens*, 62 Ind. 441; *Brumfield* v.
*Drook*, 101 Ind. 190; *Pugh* v. *Pugh*, 105 Ind. 552.
Another and wholesome rule which prevails in this State is
that the construction of a will depends not so much upon any
rigid principle of law as upon what appears by the will to
have been the testator's intention. *Lutz* v. *Lutz*, 2 Blackf.
72; *Baker* v. *Riley*, *supra*.

In the majority opinion, only parts of the will are set out,
but in view of the general rules and principles relating to
the construction of wills, which I have referred to, I deem
it important that the entire will here in controversy appear
in full in this dissenting opinion. It is as follows:

"Item 1. I will and direct that all my just debts and
funeral expenses be promptly paid.

"Item 2. I will and bequeath to my two sons, Thomas J.
Miles and John A. Miles, in trust, all my personal estate
including money on hand and due me from every source,
the same to be safely and prudently used and invested so as
to yield an income, and from said personal estate and the
income therefrom I desire and direct that my wife, Elizabeth
Miles, and my two invalid daughters, to wit, Emily Miles,
and Jane Miles, shall be provided with comfortable mainte-
nance and support in sickness and in health and a comforta-
ble and suitable home so long as they or any of them shall

live. And in the event that for any cause my sons above named fail to execute this clause of my will, I direct that the Hendricks Circuit Court shall appoint some competent and suitable person who shall fully execute this trust, and shall give bond for the faithful performance of his duties in relation thereto.

"In performance of the duties imposed by the provisions of my will I hereby authorize my said sons, Thomas J. Miles and John A. Miles, or whomsoever may act in their stead as aforesaid, to dispose of my salable personal property at such time and in such manner as will in their judgment best subserve the purpose hereinbefore specified. But such executors shall make a complete inventory of said personal estate as required by law to be filed with the clerk of the Hendricks Circuit Court, and shall report to said court at least once in every two years a true and complete account of all money received and paid out by them. And said executors shall be allowed fair and reasonable compensation for their services, to be allowed and approved by said court.

"Item 3. I give and devise to my daughter, Martha A. Walker, for and during her natural life, the full and free occupation and possession and all the rents, issues, incomes and profits of the following described real estate situated in the county of Hendricks and State of Indiana, viz.: The east half of the northeast quarter of section twelve, and the east half of the southwest quarter of section eleven, both in township fourteen north, of range one west, and also of the lands included in the following boundaries: Beginning at the half mile stake on the north side of section ten, township and range aforesaid; then south with section bearing 229 93.100 poles to a line cutting off seventy acres on the north side of the southwest quarter of said section ten; thence west with said line 45 93.100 poles to the section line; thence east with said line 45 93.100 poles to the beginning. Also, the west half of the northeast quarter of section ten, in township fourteen north, of range one west, and the west half of

the southeast quarter of section three, in the same township and range, except thirteen acres off of the west side of the last described tract. And in the event that my said daughter Martha, and her husband Columbus Walker, continue to live together as husband and wife until the death of the said Martha, they shall both jointly use and occupy said lands and have the income therefrom. And if the said Columbus Walker shall live longer than my said daughter, Martha, then in that case the said Columbus Walker shall continue to have and enjoy the possession, rents, profits, and income of the lands aforesaid so long as he, the said Columbus Walker shall live, provided he shall not be allowed to sell the timber off of or from said lands, but he may use the same for necessary improvements or betterment of said lands, and at the death of said Martha, and Columbus Walker, the lands aforesaid shall descend to my heirs at law by virtue of the laws of descent in force at the time of my death.

"Item 4. In the event that my said son-in-law, Columbus Walker, shall survive his wife, I give and bequeath the sum of $1,000 to be paid out of any surplus in the hands of my executors.

"Item 5. I give and devise to my son, Thomas J. Miles, the following lands in said county of Hendricks and State of Indiana, viz.: The west half of the southwest quarter of section thirty-six, township fifteen north, in range one west, and twenty acres off of the south end of the east half of the northwest quarter of section thirty-six; also the east half of of the southwest quarter of section thirty-six; also the northwest quarter of said section thirty-six, also the northeast quarter of section twenty-six in said township and range. Also, all that part of the west half of the southeast quarter of section twenty-three, and all that part of the southwest quarter of section twenty-three, which lies south of the middle of White Lick creek and which belongs to me. And also, all the lands I own in the northeast quarter of section thirty-six, township fifteen north, range one west.

"Item 6. I give and devise to my son, John A. Miles, the following lands situated in the county of Hendricks and State of Indiana, viz.: All the east half of section thirty-two in township fifteen north, in range one east, and all the northeast quarter of section five, township fourteen north, range one east, which belongs to me, estimated to contain 433 acres.

"Item 7. I give and devise to my son Samuel W. Miles, the following lands situated in the county of Hendricks and State of Indiana, viz.: The west half of the southwest quarter of section two, township fourteen north, range one west, and so much of the southwest quarter of the northwest quarter of said section two as lies south of the public road leading from Belleville to Clayton. Also, the east half of the southeast quarter of section three, township fourteen, range one west; also the west half of the northwest quarter of section eleven; and the southeast quarter of the northwest quarter of said section eleven; also the east half of the northeast quarter of section ten, township fourteen north, range one west.

"Item 8. It is my will and I hereby direct that the lands hereinbefore devised to my three sons, to wit, Thomas J. Miles, John A. Miles, and Samuel W. Miles, shall be appraised within a reasonable time after my decease by three disinterested men to be agreed upon by my said sons who shall fix and set upon said several tracts of land the cash value thereof, without taking into account any buildings or perishable improvements thereon. And that if there be a difference in the value thereof, those of my said sons who receive the least in value of said lands shall be made equal with the other out of my estate as hereinafter provided.

"Item 9. I will and direct that my executors hereinafter named shall make sale either at public or private sale, as they may deem best, of the following lands situated in said county of Hendricks and State of Indiana, viz.: A part of the northwest quarter of section one, township fourteen

north, of range one west, estimated to contain 43 75.100 acres, being the lands bought by me of James N. Pope, October 30, 1856, and with the proceeds of said land so far as the same may be sufficient, they shall equalize my three sons in relation to the value of the lands devised to them, when ascertained as aforesaid in item eight, of this will.

"Item 10. I give and devise to Oscar Stierwalt, $100, to be paid out of any surplus at any time in the hands of my executors.

"Item 11. It is my will, and I hereby expressly declare it to be the first object of this will, that my said wife, Elizabeth Miles, and my two invalid daughters, aforesaid, Emily Miles and Jane Miles, shall be duly and comfortably provided and supplied with all the necessaries and ordinary comforts of life including a comfortable home. And that my wife shall keep and retain in her possession all such household goods as they may need, and if my personal estate shall not be sufficient to maintain them so long as they or any of them shall live, then and in such case they or any of them shall have and hold a lien upon all the real estate which is hereby devised to my children.

"Item 12. I hereby will and direct that all of the surplus of my estate, after the execution of the several items and clauses of this will above mentioned shall be distributed among my several children, Martha, Thomas J., John A. and Samuel W. Miles, so as to make them all equal in the distribution thereof. And in the event of the death of any one of the last above named, the shares due such as may be deceased shall go to the children of such deceased person, if there be children, and if there be no children, then such share shall go to the survivors.

"Item 13. I hereby nominate and appoint my two sons, Thomas J. Miles and John A. Miles, the executors of this my last will and testament."

From the special finding of facts, and the will itself, it appears that the will was executed June 2, 1883; that

Martha, the deceased daughter, was born January 14, 1841; that she married John C. Walker October 27, 1870; that she never had any children born to her; that she adopted appellant under the laws of Indiana January 9, 1885, and that decedent had knowledge of such fact. When this will was made, the testator had a wife, three sons and three daughters. Martha was twenty-nine years old when she married. When the will was executed, she had been married nearly thirteen years, was forty-two years old, and had never borne a child. As to the testator's wife and the two invalid daughters referred to in the will, I will not notice further, for they are each dead, and the will has been fully executed as to them. In this connection, in the recital of material facts, which appear by the will and record, the significant fact that the will gave to Martha and her husband a life estate only in the real estate willed to her, while it gave to all the other children to whom real estate was willed a fee simple interest, should not be overlooked.

When a child is legally adopted under the law of this State, the relation of parent and child is thereby created, and such adopted child will inherit under the laws of descent from its adopting parent as though it were a child lawfully born to such parent. As to this proposition, there seems to be no doubt. *Davis* v. *Fogle*, 124 Ind. 41, 7 L. R. A. 485; *Humphries* v. *Davis*, 100 Ind. 274. I think it equally plain also that such an adopted child cannot, under the laws of descent, inherit from the ancestors of the adopting parent. This is obvious by analogous reasoning when we consider the fact that a parent of a natural child, who dies without issue, inherits the property of such child regardless of the source from which it was acquired; while the adopting parent only inherits such property as has come to the adopted child through the adopting parent, and all other property of the adopted child goes to its kinsmen of the same blood. *Humphries* v. *Davis*, *supra; Davis* v. *Fogle*, *supra.* An additional instance showing the status and rights of a nat-

ural child differ from those of an adopted child is that where a natural child is born after the execution of a will, where the will does not make provision for it, such birth revokes the will; while the adoption of a child, after the making of a will, where no provision is made for such adopted child, such adoption does not revoke the will. *Davis* v. *Fogle, supra.* In the case last cited, after reviewing the authorities, the court, on page forty-four by Olds, J., said: "These decisions go as far, it would seem, in holding the legal status of the adopted child to be the same as a natural child, as is warranted under the statutes."

As stated in the majority opinion, the common law made no provision for the adoption of children, and at common law the adoption of children was unknown. As to the rights and status of an adopted child, we must therefore look to the statutes, under which the relations of the adopting parent and the adopted child are created. At common law, the right of inheritance was recognized, and it only existed in the line of natural blood. The right of inheritance, therefore, which follows from the relations created by the statute authorizing the adoption of children, is a right in derogation of the common law, and such statutory rights, together with the statutes creating them, must be strictly construed against the person asserting such rights. The law of descent in this State is regulated by statute, and like the common law of inheritance it is based upon natural or blood relationship, as a rule of succession according to nature, which has prevailed for all time. An heir, in legal contemplation, is a creature of common law, while a child by adoption is a creature of statutory law. *Keegan* v. *Geraghty*, 101 Ill. 26; *Wallace* v. *Rappleye*, 103 Ill. 229; *In re Jessup's Estate*, 81 Cal. 408, 21 Pac. 976, 6 L. R. A. 594.

It has been held, and I think correctly, that an adopted child remains only such, and obtains such right of inheritance only as is prescribed by statute, but yet does not become

the child in fact of the persons adopting it. In *Barnhizel* v. *Ferrell*, 47 Ind. 335, this language is used: "By the act of adoption, the child is entitled to inherit from his adopted parent as his heir, in the degree of a child. *Barnes* v. *Allen*, 25 Ind. 222, 226. The act does not provide that he should be the child of the adopting parent, but he shall take the name, and be entitled to take his property by descent or otherwise the same as he would if he was his child or natural heir, and the adopting parent shall occupy the position toward the child of a father or mother and be liable in every way for such. In *Schafer* v. *Eneu*, 54 Pa. St. 304, it is said: "The right to inherit from the adopting parent is made complete, but the identity of the child is not changed. One adopted has the rights of a child without being a child." And in *Commonwealth* v. *Nancrede*, 32 Pa. St. 389, the same court said: "Giving an adopted son a right to inherit, does not make him a son in fact. And he is so regarded in law, only to give the right to inherit." So it is seen that by the act of adoption, the identity of the child is not changed; it does not become the child of the adopting parent in fact, and can be regarded as such only to give the right to inherit. This right of inheritance also is a statutory right, and cannot be enlarged by intendment. See, also, *Russell* v. *Russell*, 84 Ala. 48, 3 South. 900; *Schafer* v. *Eneu*, 54 Pa. St. 304; *Barnes* v. *Allen*, *supra*.

In Vol. 24 Am. & Eng. Ency. of Law 424, referring to statutory enactments for the adoption of children, it is said: "The general effect of these statutes is that the adopted child becomes entitled to succeed to the estate of the adopting parent in the same manner as if it had been a child of the blood of such parent. * * * And, indeed, the general effect of the decisions is to deny the right of the adopted child to succeed to the estate of any member of the adopting family other than the adopting parents. So, it has been held that an adopted child does not succeed to the estate of the adopting parent's ancestors, nor to the estate of children

born to the adopting parents.   See *Sunderland's Estate*, 60 Iowa 732, 13 N. W. 655; *Meader* v. *Archer*, 65 N. H. 214, 23 Atl. 521; *Keegan* v. *Geraghty, supra; Davis* v. *Fogle, supra; Helms* v. *Elliott*, 89 Tenn. 446, 14 S. W. 930; *Wyeth* v. *Stone*, 144 Mass. 441, 11 N. E. 729.

Children born to the adopting parents do not become brothers or sisters, as the case may be, to the adopted child, and neither can the one inherit from the other.   While a child acquires certain additional rights because of the adoption under a statute, there is nothing in the act of adoption which takes away existing rights, and, on becoming entitled to inherit from its adopting parents, the adopted child does not thereby lose its right to inherit from its natural parents. Vol. 24 Am. & Eng. Ency. of Law, 425; *Wagner* v. *Varner*, 50 Iowa 532.

It might be profitable to review the statutory provisions of some of the states relating to the adoption of children in comparison to our own statute upon that subject, but time forbids.   As was said in *Markover* v. *Krauss*, 132 Ind. 294, 17 L. R. A. 806: "There is, however, but little, if any, uniformity in the various statutory provisions, and a study of the several statutes, with the constructions given them by the courts, gives us but little light on the point of difficulty."   The provisions of our statute, so far as the questions here involved are concerned, are as follows:   §837 Burns 1894:   That "from and after the adoption of such child it shall take the name in which it is adopted and be entitled to and receive all the rights and interest in the estate of such adopting father or mother, by descent or otherwise, that such child would if the natural heir of such adopting father or mother."   And the following section provides:   "After the adoption of such child, such adopted father or mother shall occupy the same position toward such child that he or she would if the natural father or mother."

In the several cases of *Barnes* v. *Allen, supra, Isenhour* v. *Isenhour*, 52 Ind. 328, *Keith* v. *Ault*, 144 Ind. 626,

*Patterson* v. *Browning*, .146 Ind. 160, and *Markover* v. *Krauss, supra,* all have relation to questions of descent from the adopting parent to the adopted child, and these were the only questions there decided that have any weight and bearing here.   None of them have reference to the right of an adopted child to take under the will of the ancestor or ancestors of the adopting parent.   The exact question therefore presented by the record in this case has not been before the courts of last resort in this State.   At least the most diligent search on my part has failed to find a case where the question has been adjudicated upon by our courts.   The case of *Schafer* v. *Eneu, supra,* is more directly in point here than any cited, or which I have been able to find.   There, one Theresa Clark, under the laws of Pennsylvania, adopted three children, as she expressed it in her will, "as my children and heirs, with the view and intent that they shall have all the rights of children and heirs of their adopting parent according to the laws of Pennsylvania, and shall thereby inherit the property and estate devised to me for life, and after my death to my children, and their heirs, by the last will and testament of my father, James Eneu, deceased."   James Eneu, by his will, devised to George Clark certain premises, reserving a certain annual rent which he devised to Theresa Clark, his daughter, for life, and upon her decease the same was to go to her children and the heirs of her children forever, and gave the residue of his estate to his children, naming them.   Theresa Clark died without having children born to her.   In discussing the case presented by these facts, the court said:   "If therefore the adopted children are the owners of the rent, it is because they are devisees under the will of James Eneu, the first testator.   But his gift of the remainder was to the children of his daughter Theresa Clark, and the heirs of her children.   Adopted children are not children of the person by whom they have been adopted, and the act of Assembly does not attempt the impossibility of making them such.   It enacts that it is lawful for any per-

son desirous of adopting any .child as his or her heir, or as one of his or her heirs, to present his or her petition to a court" etc., "declaring such desire, and that he or she will perform all the duties of a parent to such child," "and such court," etc., "may decree that such child is heir of such adopting parent." There is a proviso enacting that if such adopting parent shall have other children, the adopted child shall share the inheritance as one of them in case of intestacy, and that he, she, or they shall inherit respectively from and through each other, as if all had been the lawful children of the same parent. The right to inherit from the adopting parent is made complete, but the identity of the child is not changed. One adopted has the rights of a child without being a child. In *Commonwealth* v. *Nancrede*, 32 Pa. St. 389, it was ruled that property descending to an adopted child is subject to the collateral inheritance tax. That could not be if the adopted were a child. In Nancrede's case, Lowrie, C. J., said: "Giving an adopted son a right to inherit does not make him a son in fact. And he is so regarded in law, only to give the right to inherit." From the opinion in the case from which we have just quoted, it appears that the will of James Eneu took effect in 1851. It gave a life estate in the rent to Mrs. Clark with a contingent remainder to her children, and the residue of his estate to his children, naming them, in fee.

It is true, as shown in the prevailing opinion, that in *Sewall* v. *Roberts*, 115 Mass. 262, a rule of construction was announced directly opposite to that announced in *Schafer* v. *Eneu, supra*. An examination of that case, however, discloses the fact that the statutory provision in Massachusetts regulating the adoption of children is much broader, and confers additional rights upon an adopted child, which are not given either by the statute in Pennsylvania or this State. The Massachusetts statute declares that an adopted child "shall be deemed, for the purposes of inheritance by such child and all other legal consequences and incidents of the

natural relation of parents and children, the child of the parents by adoption, the same as if he had been born to them in lawful wedlock." Under this broad and comprehensive provision of the statute, it was held that where a deed of trust was made without reserving any power of revocation, and the deed provided that the income from the estate was to be paid to the grantee for life, and upon his death to transfer the principal sum to his executor in trust for the especial use and benefit of any child or children of the grantee, and when afterwards such grantee adopted a child under the statute, and died, leaving no other child, that such adopted child took the estate as a "child", under the settlement as one of the "legal consequences and incidents of the natural relation of parents and children," by virtue of the statute. In upholding the claim of the adopted child, the court said: "This language is very broad and comprehensive, and it was manifestly the intention of the legislature to provide that, with the exceptions named, the adopted child should, in the words of the sixth section, 'to all legal intents and purposes be the child of the petitioner.' The adopted child, in this case, * * * must be regarded in the light of a child born in lawful wedlock." After the decision in *Sewall* v. *Roberts*, *supra*, the legislature amended the statute. Pub. Stat. Ch. 148, §§7 and 8. The statute provided that as to succession or inheritance of property, an adopted child "shall take the same share of property which the adopting parent could have devised by will that he would have taken if born to such parent in lawful wedlock, and he shall stand in regard to the legal descendants, but to no other of the kindred of such parent, in the same position as if so born to him." The following section provides: "The term child, or its equivalent, in a grant, trust-settlement, entail, devise, or bequest, shall be held to include a child adopted by the settler, grantor, or testator, unless the contrary plainly appears by the terms of the instrument; but when the settler, grantor, or testator is not himself the adopting parent, the

child by adoption shall not have, under such an instrument, the rights of a child born in lawful wedlock to the adopting parent, unless it plainly appears to have been the intention of the settler, grantor, or testator to include an adopted child."

It seems clear to me that the subsequent amendment of the statute was made by the legislature because it had been demonstrated by the construction placed upon it in *Sewall* v. *Roberts, supra,* that it was too broad and comprehensive and conferred rights upon adopted children that the legislature did not intend to confer, and the amendment was made to avoid the consequent evil which might result therefrom. While the decision in that case declared the law, as applied to the particular facts and the statute as it then existed, yet, in my judgment, the rule there announced is not binding here, and is not authority. In a later case, after the statute was amended, the last cited statute and the *Sewall* v. *Roberts* case were under consideration, and the court said: "These provisions made a material change in the law as to the rights of adopted children, and therefore the decision of *Sewall* v. *Roberts*, 115 Mass. 262, does not aid us in the present inquiry." *Wyeth* v. *Stone*, 144 Mass. 441. While this case does not decide the question at issue, the reasoning of the court in discussing the facts is so forcible and able that it is worthy of some space in this opinion. The facts, as fairly stated by counsel for appellee, are as follows: In this case one Jaiel Baker died in 1873, leaving a widow and no children except an adopted daughter, Eliza Stone. By his will he left all his property to a trustee who was directed to pay all the income to his wife during her life, and by the second clause of his will he gave, at the death of his wife, certain pecuniary legacies to her nephews and nieces. The third clause of the will is as follows: "After payment of the foregoing legacies, I give, bequeath and devise all the remainder of my estate to my adopted daughter, Eliza Stone, wife of Howard Stone, of said Waltham, in her own right; but if

said Eliza Stone shall die without issue, before the decease of my said wife, then I give, bequeath and devise said remainder to the heirs at law of my said wife." Eliza Stone, the adopted daughter, died without issue in May, 1877. The wife of the testator died in 1883. She had no natural children, but in September, 1877, she adopted the tenant residing on her land. The court held that such adopted son of the above mentioned wife adopted after the testator's death was not entitled to take under the terms "heirs at law", used in said third clause. The court in construing said will and the above sections of the Massachusetts statutes says: "The design of the legislature in this statute clearly was to qualify and limit the right of an adopted child under the previous statute, as construed by the court. The purpose of the statute seems to be to make a distinction between property which the adopting parent owns and can dispose of by will, and other property or rights which a child born in wedlock can take derivatively through or by reason of his kinship to his parent. Thus, in the seventh section, an adopted child will take by succession or inheritance the same share of the property which the parent owns, so that he can dispose of it by his will as if he were. a child born in wedlock; but he cannot take property not owned by the parent, but which would come to a child born in wedlock by right of representation after the parent's death. He can inherit directly from the parent, but he can not inherit in lieu of his parent by right of representation from any of his parent's kindred. The purpose of the eighth section, is to provide for cases where property comes to a man's children, not by inheritance, but under a settlement, trust deed, or will, and to establish a rule governing the rights of adopted children in such cases. There is no word which is exactly the equivalent of 'child', so as to be interchangeable with it under all conditions. We think the intention was to provide, that if, by settlement, deed, or will, property is given by terms which embrace and include a child born

in wedlock, and which, in their application to existing facts, have the same effect and mean the same thing as child or children such as the term 'issue,' 'descendant', or 'heir at law,' the rule provided by this section shall apply in the construction of the instrument. Any other construction would give the statute a very narrow scope, and to a great extent, defeat its purposes. In the case at bar, the property is devised to 'the heirs at law of my said wife.' The tenant is not the natural heir at law of Mrs. Baker. The statutes do not give him all the qualities and rights of an heir at law, but only certain limited rights. * * * The will shows that the testator had in his mind the natural heirs of his wife, as he gives to most of them pecuniary legacies describing them as 'my nephews and nieces.' There is nothing to show that he contemplated that his wife might, after his death, adopt a child; and it is impossible to say that, in the words of the statutes, it plainly appears to have been the intention of the testator to include in his devise an adopted child of his wife."

The case of *Keegan v. Geraghty*, 101 Ill. 26, is instructive as to the relations between an adopted child and the adopting parent. The question at issue in that case was one of descent under the statute of Illinois, as to the right of an adopted child to inherit from children by birth of the adopting parent, and illustrates with what strictness such statutes will be construed as against the adopted child. In the opinion, the court said: "But a majority of the states of the Union have enacted statutes of adoption. There is not uniformity in such statutes. In no two of them, perhaps, are the new rights and obligations precisely the same. * * * Our statute of adoption provides that the child adopted shall be deemed, for the purpose of inheritance by such child, the child of the parents by adoption, etc. 'For the purpose of inheritance of such child,' from whom? The statute does not say, but we say, from the adoptive parents. We think it must be so limited from the nature of the proceeding, the

propriety of so doing, and from the absence of express words of further extent. The proceeding of adoption is one entirely between such parents and the child, at the instance, by the consent, and upon the petition of the parents or parent. The artificial relation from adoption is established between these parties, and the statute defines what shall be the duties and rights of the parties from this relation between them. As we construe the statute, as between the parties to the transaction the adopted child is deemed, for the purpose of inheritance from the adoptive parents, their child, the same as if he had been born to them in lawful wedlock. And when such an adoptive parent dies intestate, having no children born to him in wedlock, it is reasonable and just that the property he leaves should go to a stranger to his blood, his adopted child. It would be a consequence of his own desire and request in the taking of the adoption proceeding. But another person, who has never been a party to any adoption proceeding, who has never desired or requested to have such artificial relation established as to himself, why should his property be subjected to such an unnatural course of descent? To have it turned away upon his death from blood relations, where it would be the natural desire to have property go, and pass into the hands of an alien in blood,—to produce such effect, it seems to us, the language of the statutes should be most clear and unmistakable, leaving no room for any question whatever. We find in our statute of adoption no express language giving to the adopted child the right to inherit from any one else than the adoptive parents. By the statute the adopted child is to be deemed the same as if born in lawful wedlock, for the purpose of inheritance by such child, 'and the legal consequences and incidents of the natural relation of parents and children.' These last general words, we think, are to be qualified in like manner as the others remarked upon, by restriction to the parties to the adoption proceeding and the persons named in the statute. Surely, in this generality of

language there can not be found given the important right to inherit from a person other than the adoptive parents."

Appellant has cited many cases involving the right of an adopted child to inherit from its adopting parent. The rule fixed by the decisions in those cases, I most heartily concede, and cheerfully accept as the law; but such cases do not throw any light upon the question here presented. In the prevailing opinion, many of those cases are cited and commented upon, and as they are not of controlling importance here, I do not deem it necessary to refer to them or to discuss them at any length. There is one case, however, I desire to mention, *Van Matre* v. *Sankey*, 148 Ill. 536, 36 N. E. 628, 23 L. R. A. 665, 39 Am. St. 196. The question at issue there was one of descent from the adopting parent to the adopted child. Following the decision in that case, as reported in the last cited report, is the following note: "Very often, in wills, property is devised to a specified person, and, after his death, to his heirs or next of kin, or to his heirs at law, and then in the event of his having an adopted child, the question is, whether such child is included within these words, and therefore entitled to the benefit of the devise or bequest. In the absence of circumstances tending to show that the testator anticipated the adoption, or knew that it had already taken place, and therefore probably intended to treat the person adopted as a possible beneficiary, the decisions generally exclude the adopted child from the benefit of the will." *Jenkins* v. *Jenkins*, 64 N. H. 407, 14 Atl. 557; *Morrison* v. *Sessions*, 70 Mich. 297, 38 N. W. 249, 14 Am. St. 500; *Reinders* v. *Koppelman*, 94 Mo. 338, 7 S. W. 288; *Schafer* v. *Eneu*, 54 Pa. St. 304; *Wyeth* v. *Stone*, 144 Mass. 441, 11 N. E. 729. In *Jenkins* v. *Jenkins*, *supra*, it was said: "If the adopted child, not being an heir, can by statute be created one for the purpose of inheritance, such a statute can not be used to defeat the manifest intention of the testator, which is controlling in the construction of wills." In many cases it is correctly held that

greater regard is had to the clear intent of the testator in the construction of a will, than to the particular words used in seeking to identify the persons intended as beneficiaries. *McLeod* v. *McDonnel*, 6 Ala. 236; *Travis* v. *Morrison*, 28 Ala. 494; *Bond's Appeal*, 31 Conn. 183; *Stevenson* v. *Druley*, 4 Ind. 519; *Ely* v. *Ely*, 20 N.·J. Eq. 43. If a will is capable of two interpretations, that one should be adopted by the courts which gives preference to blood relatives, rather than strangers. 4 Kent. Com. (11th ed.), 535; *VanKleeck* v. *Dutch Church*, 20 Wend. 457; *Scott* v. *Guernsey*, 48 N. Y. 106; *Quinn* v. *Hardenbrook*, 54 N. Y. 83, 86; *Kelso* v. *Lorillard*, 85 N. Y. 177; *Wood* v. *Mitcham*, 92 N. Y. 375, 379; *Downing* v. *Bain*, 24 Ga. 372; *Smith's Appeal*, 23 Pa. St. 9. In many cases it has been held that where the words "issue" or "children" or "heirs at law" have been used in a will, a child adopted after the execution of the will could not take under such words. *Jenkins* v. *Jenkins*, *supra; Russell* v. *Russel*, 84 Ala. 48, 3 South. 900; *Barnum* v. *Barnum*, 42 Md. 251; *Schafer* v. *Eneu, supra; Bowdlear* v. *Bowdlear*, 112 Mass. 184; *Wyeth* v. *Stone, supra*. I find very many cases which hold that the word "children", being confined to issue in the first degree, when used in a deed or will, applies primarily to a specific and determinable class; and that the term is a *designatio personae* and indicates not inheritable succession, but individual acquisition. The word "child" is a word of limitation. For authorities see following note 1, page 232, Vol. 3 Am. & Eng. Ency. of Law. In Anderson's Law Dict. p. 174, the word "child" is defined as follows: "3. A legitimate descendant in the first degree." In common parlance, and as generally used and understood, the word "children" does not include any other than the immediate descendants in the first degree of the ancestor. It may, however, include others, as where it appears from a will that there are no other persons in existence who will answer the description of children except descendants of a degree remoter than the first; or where there could not be

any of the first degree at the time or in the event contemplated by the testator; or where he has shown by other words that he used the word "children" as synonymous with descendants, or issue, or to designate or include illegitimate offspring, etc.   Of the many cases in support of this definition, I cite these: *Mowatt* v. *Carow*, 7 Paige 328; *Palmer* v. *Horn*, 84 N. Y. 516; *Ingraham* v. *Meade*, 3 Wall, Jr., 32; *Rogers* v. *Weller*, 5 Biss. 166; *Feit* v. *Vannatta*, 21 N. J. Eq. 84; *Bates* v. *Dewson*, 128 Mass. 334.   Mr. Jarman on Wills (R. & T.), Vol. 2, 690, says: "The legal construction of the word children accords with its popular signification, namely, as designating the immediate offspring; for, in all cases in which it has been extended to a wider range of objects, it was used synonymously with a word of larger import, as issue." In Vol. 2, Redfield on Wills (2nd. ed.); p. 15, it is said: "The word 'children' as well as all other similar descriptive terms of classes or relations, it will be borne in mind, must always be understood in wills, in its primary and simple signification, where that can be done." Mr. Schouler on Wills, §534, says: "By 'children,' whether of the testator or some other person, a will is generally understood to denote all of the blood offspring, whether by one marriage or more.   But children by affinity, such as a son's widow, are *prima facie* excluded; and so are stepchildren." The interpretation put upon the word "children" by these great authors, and as construed by the courts in the many cases cited, and others, ought to be sufficient to determine the status of the appellant in this case, without looking further to the will in determining the intention of the testator, and who was embraced in the will as objects of his bounty.   This technical meaning has long been given to the word in the construction and interpretation of wills. In construing a will and in interpreting the words used therein, we must presume that the testator fully undertsood the meaning of the words used by him, and that he used them in their simple, primary and usual meaning.   Hence in the use of the word

"children" in item twelve of the will under review, we must presume that he used it in its primary and simple signification, and that he intended it to embrace his immediate offspring and the immediate offspring in succession. The Supreme Court of this State has recently put a construction upon the word "child" or "children" as follows: "It is a rule of construction that *prima facie*, the word child or children, when used either in a statute or will, means legitimate child or children." *McDonald* v. *Pittsburgh, etc., R. Co.*, 144 Ind. 459, 32 L. R. A. 309. In that case many authorities were collected and cited in support of the rule announced, and I content myself by referring to them there. True, an adopted child, within the meaning of the statute, is a "legitimate child" of its adopting parent, but the words "legitimate child", as used by law writers and in the adjudicated case, means, unless otherwise designated, children born in lawful wedlock. Counsel for appellees have cited the case of the *New York Life Ins. Co.* v. *Viele*, 22 Hun App. Div. 80, 47 N. Y. Supp. 841, and put much reliance upon the decision to support their contention here that the word "children", as used in item twelve of the will, does not embrace appellant. In the prevailing opinion that case is referred to and the facts upon which it rested are fairly stated, but the learned judge who wrote the prevailing opinion says that the case is not in point. I concede that the case and the one now under consideration are strongly different in point of facts, but the principles discussed, and the reasoning used, do in my judgment lend support to the position of appellees. I need not here state or refer to the facts in that case, but I deem it of importance to make some quotations from it. The court said: "At the time of the execution of the will, the testatrix's daughter, Emily, was then but forty years of age, and it cannot be said that there was no possibility of her having any children in the future. There is nothing in the will itself, or in the situation of the parties at the time of the

execution of the will, that would justify the court in assuming that this testatrix intended to give to the words 'living lawful issue' any other meaning, viz.: That of children or their descendants, and nothing from which an inference could be drawn, that the testatrix intended to include within the class thus specified any person but the actual offspring of her daughter or their descendants. It is true that at the time of the execution of the will, Mrs. Lengnick and her husband had adopted this child, and that by that adoption, under the law of Saxony, the child had acquired a certain legal status, with certain defined legal rights; but such an adoption did not by the law of Saxony give to such child all the rights of a child born of the body of the persons who had adopted her; nor would she be included within the legal definition of the term 'lawful issue.' The court in construing this statute say: 'The relation here provided for is that between the adopted child and the adopting party; that relationship is reciprocal. The duty of the adopting party is that of a parent, and the duty of the adopted child toward the adopting party is that of a child of a marriage of its parents. This section gives to the child no right as to other not adopting parties; and where the code speaks of the right of an adopted child to inherit, it is provided that adopted children inherit from the adopting party the same as children of the marriage, unless otherwise provided in the contract of adoption.' Thus, no right is given to an adopted child by the code to inherit from others than the parties who have adopted the child. This limitation would seem to have important bearing. Thus, persons adopting a child could assume a relationship to the adopted child, and by their voluntary act such adopted child acquires a right to inherit their property; but it would be a much more extensive right to bestow upon an adopted child the right not only to inherit from the adopting parties property which belonged to them, but also the right to inherit property belonging to the family of the adopting parties, who had no voice in the adoption of

the child, and thus bring in a person to inherit their property who was not of their blood, and in whom it was possible they had no interest." The court in commenting upon the weight that should be given the provisions of the Saxony code, in reference to the adoption of heirs, in the construction of this will, says: "Here, however, we have to construe, not so much the meaning of the Saxony code as the intention of this testatrix in the making of the will in question. Her intention must be ascertained from the words used in the will, considering the circumstances surrounding the testatrix and the objects of her bounty at the time of the making of the will; and in ascertaining that intention it is, we think, immaterial as to what construction the Saxony court would give to the Saxony code. What we have to do is to ascertain what disposition this testatrix intended should be made of this share of her estate, after the death of her daughter Emily, and considering all the language used in the will, and the surrounding circumstances, we think it is clear that the testatrix did not intend that this share of her estate, given to her daughter Emily, for life, should upon her death, go to this adopted child, rather than to her own grandchildren, for whom she was so particular to make explicit direction as to their ultimately becoming the owners of all her property, upon the condition of her daughter Emily dying without living children. To hold otherwise would result in giving to this adopted child, who was no relative of hers, and upon whom she had not shown any express intention to confer it a much larger portion of her estate than is given to any of her own grandchildren; and we certainly do not think that we would be justified in adopting such a conclusion in the absence of an intention thus declared." It is unnecessary for me to make any comment on what the court said in that case further than to say that it seems to me that the principles there discussed strongly entrench and strengthen the right of appellees to have the residue of their ancestor's estate distributed to them. If

I properly comprehend the scope of the prevailing opinion, the decision is made to rest upon the fact that by adoption appellant became the child of Mary Walker, and as she survived her adoptive mother, she is entitled to share in the distribution of the residue of the estate, as directed in item twelve of the will, on the ground that the word "children", as there used, is sufficient to designate her as one of the distributees upon the death of her adopted mother.

I have tried to show in this dissenting opinion, and feel that I am abundantly sustained by the great weight of the authorities, that the word "child", as used in the will, does not include the adopted child of a residuary legatee, who is made by the will a distributee under it. I am clearly of the opinion that under all the rules for the construction of wills, appellant can not, by the will itself, be designated or identified as a legatee. It is the rule that words occurring more than once in a will must be presumed to be used in the same sense, unless a contrary intention appears by the context. Thus in Jarman on Wills, in his chapter on general rules of construction, it is said: "That words occurring more than once in a will shall be presumed to be used always in the same sense, unless a contrary intention appears by the context, unless the words be applied to different subjects." And it was so held in *State Bank* v. *Ewing*, 17 Ind. 68. On examination of the will in this case, it will be found that the word "children" occurs four times, and only in item twelve. After the several bequests made, preceding item twelve, which disposed of all the testator's estate except an undetermined surplus, he first directs that such surplus shall be distributed among his several children, Martha, Thomas J., John A. and Samuel W., and that they shall share alike in such distribution. Then the will provides that in the event of the death of either of the parties named, the shares due such as are deceased shall go to the children of such deceased person, if there be children, and if there be no such children, then such shares shall go to the survivors. It will

not be denied but what the testator, when he used the word "children" in the first instance, meant the children of his body; children of his blood born to him in lawful wedlock. It seems equally clear to me that when he again used the word "children", he meant to include the children of his children, of the same blood and not otherwise. It also appears to me from the language used, that it was the intention of the testator that no part of his surplus estate should pass from his lawful descendants, for he specifically provides that if there shall be no children of his children, it shall go to the survivors of his own children. As we have seen, words employed in a will must be given their ordinary meaning, unless there is language in the will which indicates clearly that the testator did not use the words in question in their plain and ordinary sense. See *West* v. *Rossman*, 135 Ind. 278. There is certainly no language in this will which indicates clearly that the testator did not use the word children in its plain and ordinary sense, and according to its common acceptation.

When the will in question is measured by the general principles I have stated and discussed, and which are supported by the authorities, and when we apply to it the rules of construction adhered to by the courts, I do not see how it is possible to construe it as expressed in the prevailing opinion, so that appellant can become a legatee under the provisions of item twelve. To my mind, and according to my judgment, the construction so placed upon it is a forced one, and does violence to the manifest and clear intention of the testator. John Miles had accumulated a comfortable fortune, both in real and personal property. He had raised a family of four children, who had grown to manhood and womanhood. These children had doubtless labored for him and by their labor materially aided him in amassing his fortune. By his will, he disposed of all his property. Throughout the entire instrument, the fact that the particular, special and, with two exceptions, the full and whole

subjects of his bounty were his wife and children of his body clearly appears. He made a bequest of $1,000 to his son-in-law, and one of $100 to one Oscar Stierwalt, and with these exceptions it seems to me that he intended that all the rest of his property should vest in his own children after the death of his wife and invalid daughters. His daughter Martha was twenty-nine years old when she was married. When the will was made, she was forty-two years old and had not had born to her any children. She had almost reached the usual age when a woman ceases to bear children. The probabilities are that she never would have borne a child, and I have no doubt but what her father, when he made his will, had that fact in mind. Why did he give to his three sons valuable real estate in fee and to his daughter Martha only a life estate in real estate? The answer is plain. She was childless, and likely to be childless, and his object was to dispose of his real estate and other property so that it would not pass from his lineal descendants. If he had given to her real estate in fee simple, and she died without issue, such real estate would not have gone from his lineal descendants, unless she had died before her husband. Or if the real estate had been given to her in fee simple, she could have disposed of it by will, and it might thus have passed out of the family. Under that clause of his will giving a life estate to his daughter and son-in-law, he provided that at their death, it should go to his heirs at law. Martha and her husband were even forbidden to sell the timber from the land, for the evident reason that it would depreciate its value, when it should in the contingencies named vest in his heirs at law. But a stronger reason yet remains which shows that it was the intention of John Miles to provide that his entire estate, with exceptions mentioned, should eventually vest in his heirs at law. It is this: If, at the time he executed his will he did not believe his daughter would die childless, why would he give to her only a life estate in real estate, which then was the only property he was certain

would go to her, thereby preventing her children from inheriting from their mother that which, according to the laws of descent, would be theirs? At that time, he did not know that there would be any surplus of his estate. His entire estate was charged with a sacred trust in the care and maintenance of his wife and invalid daughters. That was declared to be the first object of the will, and it was impossible to know what portion of his estate would be thus consumed. If he had believed his daughter would bear a child, and then provided that the real estate given to her for life should at her death go to his heirs at law, he did a great injustice to the possible issue of her body, which does not harmonize with his generous and bounteous nature as it is written in almost every line of his will. Again appellant was not adopted as the daughter of Martha until nearly two years after the will was executed. It can not be said, with any reason, that he contemplated such adoption. After the adoption, of which fact he had knowledge, ample time elapsed for him to have placed a codicil to his will and made provision for her, if, indeed, he intended that she should be an object of his bounty and affection.

In concluding this dissenting opinion, which has been extended far beyond my first intention, I conclude by again saying that the intention of the testator is to be collected from the whole will together, and the language used is to be construed in reference to and in connection with the circumstances surrounding the testator at the time of the execution. Every will also should be interpreted, as far as possible, from the standpoint apparently occupied by the testator. In addition to the authorities above, I cite the following: Schouler on Wills, §§466, 469; Smith v. Bell, 6 Pet. 68; Blake v. Hawkins, 95 U. S. 315; Brown v. Thorndike, 15 Pick. 388; Postlethwaite's Appeal, 68 Pa. St. 477. Taking and construing the will as a whole, interpreting it as far as possible from the standpoint of John Miles, looking at and considering the circumstances surrounding

Bray *v.* Miles.

him at the time, placing myself as nearly as possible in his situation and condition, and giving the benefit of the doubt, if there is any doubt, as to what his intention was, as expressed in item twelve, and adopting the construction which casts the property where the law would cast it if no will had been made, I am unable to accept the construction given it by my associates, which bestows upon alien blood, an entire stranger, a considerable portion of his surplus estate.

Entertaining, as I do, no doubt respecting the intention of the testator, as plainly, clearly and manifestly expressed in his will, to give in equal portions the residue of his property to his own children, and the children of those who might die, and that it was not his intention to include appellant, who was not known to him, who was of alien blood, an entire stranger, I hold that she has no claim upon his estate as a legatee, or otherwise, and is not entitled to share in its distribution.   The judgment should be affirmed.

## On Petition for Rehearing.

Per Curiam.—The learned and forceful brief in support of the petition for a rehearing would seem to exhaust the authorities and reasons to be adduced in support of appellee's view of this cause.   While additional citations are given and instructive comment made upon the numerous authorities referred to, it is proper to say that the court by oral argument and able briefs had had urged upon its consideration the reasons for affirming the judgment of the lower court presented in support of the petition for a rehearing.   For this reason we do not deem it necessary, however interesting it might be, to consider in detail the same propositions so ably re-discussed.   Let it suffice to say that after a review of the authorities and a careful consideration of the reasons set out in the petition, and the briefs in support thereof, we are of the opinion that the decision should stand.   Petition overruled.

## DISSENTING OPINION.

WILEY, C. J.—Appellees have petitioned for a rehearing and have based the same upon six grounds, viz.: (1) That the court erred in construing the statute of the State concerning the adoption of children; (2) that the court erred in construing the will of John Miles; (3) that the court erred in holding that the word "children", as used in the will, meant and included the adopted child (appellant) of the testator's daughter, Martha Walker; (4) that the court erred in that it did not, in the construction of the will, give effect to the intention of the testator, but on the contrary defeated his intention; (5) that the court erred in holding that appellant is a devisee or legatee of the testator, John Miles, and (6) that the court erred in adjudging that the facts specially found entitled appellant to judgment.

The petition for a rehearing is supported by a very able brief, and in view of the fact that the majority of my associates still adhere to the conclusions reached in the prevailing opinion, and hence affirm as the law the several propositions thereby established, I deem it important and proper to make some additional observations upon the very important and interesting questions at issue. I am so thoroughly convinced that the rules announced in the prevailing opinion are in conflict with the law, as established by the great weight of authorities, that I can not let them pass without more fully expressing my views.

In my original dissenting opinion I stated that the construction placed upon the will of John Miles in the majority opinion was so foreign to the manifest intention of the testator, as plainly expressed by his whole will, that violence was thereby done to such intention; and also to hold that under the will appellant was entitled to share in the residue of the estate to which Martha Walker would be entitled, if living, was to hold that it was the manifest intention of the

testator, from the will itself, to give to her who was alien blood to him, an entire stranger, in fact not in legal existence at the time the will was made, an equal share of his estate.    Upon a reëxamination of the authorities, and a careful consideration of the argument, both in the original briefs and the briefs in support of the petition for a rehearing I am more strongly convinced than ever that the authorities will not support the construction given to the will, nor the construction given to the statute, so that the word "children", as used in subdivision twelve, embraced, or was intended to embrace, an adopted child.    As to the cardinal rule for the construction of a will, viz., that the intention of the testator must prevail, my associates and myself fully agree.    As Judge Redfield says:    "The intention of the testator is the polar star."    Our point of divergence is in interpreting the will as to what the intention of the testator was in the language used in subdivision twelve taken in connection with the whole will.    My contention here is that my associates departed from that rule, so well established, and instead of giving effect and force to the intention of the testator, frustrated and confounded it.    By the majority opinion, the clear intention of the testator, as gathered from the entire will, as it seems to me, has been diverted, and a large portion of his estate given to one of alien blood, upon which it was not his intention that his will should operate, or upon whom his bounty should descend.    It seems perfectly obvious to me that when we read the twelfth subdivision of the will in connection with and in the light of the whole will, and especially the third item or subdivision, that it was the manfest intention of John Miles to provide for a designated class of persons, who were to be objects of his bounty, and that the class thus provided for was composed of those who were of his own blood.    By his will, he was making provision for such class of persons, and it was upon them that his mind was fixed.    He did not contemplate making provision for strangers, or aliens, and to construe the will differently is not

only reading something into the will that is not there, but it is also reading something into the will that the testator had no intention of putting there, or that should be there. As I tried to show in my original dissenting opinion, and think that I did show, the will, as a whole, plainly expresses the intention of the testator, and that intention was to provide for those of his own blood. This fact is made doubly plain and specially clear and certain by the following clause in item three, viz.: At the death of said Martha and Columbus Walker, the lands aforesaid shall descend to my heirs at law." If it was the intention of the testator that a possible adopted child of Martha should share in his estate, why did he not provide that certain real estate should go to her in a certain contingency, as well as that she should share in the residue of his personal estate? It is clear that by the adoption of the appellant by Martha Walker, she (appellant) did not become the heir of Martha Walker's father, though by the adoption she did become her heir. A will should be construed so as to make all of its provisions harmonious and consistent, and so as to carry out the general scheme of its author. A construction which will create inconsistencies is not allowable.

In *Jackson* v. *Hoover*, 26 Ind. 511, the court quoted approvingly from Jarman on Wills as follows: "That all parts of a will are to be construed in relation to each other, and so as, if possible, to form one consistent whole. Courts will look to the circumstances under which the devisor makes his will, as the state of his property, of his family and the like." In no sense could the heirs of Martha Walker be the heirs of John Miles, unless they were of his blood. When he used the words "my heirs at law", he meant simply what the law implies,—heirs of his own blood. It is only by extending the word "child" far beyond its primary, etymological and legal signification that it can be held that John Miles said by his will, and thereby intended to say, that a child of an entire stranger to him was to him his daughter's child in the sense of being entitled to share in

Bray *v*. Miles.

his will under subdivision three thereof.   She was not the child of the child of the testator within his meaning that she should be one of his beneficiaries.   Appellant is not a descendant of the father of Martha Walker, for she is not of his blood, but is of the blood of strangers.   And not being a descendant, she can not, as to him, be a child of his daughter, within any reasonable or legitimate meaning of the word "child" or "children".   Again, by reference to item two of the will, which I need not here repeat, as the will appears in full in my former opinion, it will be seen that its provisions further exhibit and make plain the intention that was foremost and dominant in the mind of the testator in the execution of his will only to make provision for those of his own blood and to whom he was united by natural affection.   I assert without fear of successful contradiction that there is not a single clause, word, or sentence in the whole will that even indicates a remote intention on the part of John Miles to bestow any part of his estate upon any one, except those of his own blood, unless it be the use of the word "children" in item twelve.   On the contrary, every word, clause, and sentence in the will, and the circumstances and conditions that surrounded him when it was executed, point with unerring certainty to the fact that his intention was to bestow his entire estate in just and equitable proportions, only upon those of his own blood.   Nor do I concede that the word "children", as used in item twelve, and as meant by him, as shown by the entire will, included or was intended to include any one else.   Why would he make a liberal provision for appellant, who was an entire stranger to him; who was not in legal existence, and who could not have been in his mind?   Can a person intend to include one in his will who does not exist, except when its provisions are broad enough to embrace one subsequently and legitimately born, to which such provisions would apply and upon whom they would operate?   Can a person by his will intend to bestow a bounty upon a person who is a stranger to him, and

who is not in his mind when such will is executed? If my learned associates will satisfactorily answer these inquiries within the light of the will of John Miles, and all the authorities, then I will yield the point and believe what now seems to be impossible. The very word "intention" itself is conclusive, it seems to me, that in the majority opinion the intention of the testator has not been carried out, but on the contrary perverted. The meaning of the word as defined by lexicographers is plain and unequivocal. In defining the word, Webster says: "A stretching or bending of the mind toward an object; closeness of application; fixedness of attention." Again: "A determination to act in a certain way, or to do a certain thing; design." And again: "The object toward which the thoughts are directed; end; aim." Mr. Locke says: "Intention is when the mind, with great earnestness, and of choice fixes its view on any idea." Locke on Human Understanding, 11, xix 1. As defined in the Century Dictionary, p. 3136, intention is "that which is intended, purposed or meant; that for which a thing is made, designed or done."

Taking the meaning of the word as thus defined, how is it possible, within the light of the authorities, to single out the word "children" in item twelve, and conclude that appellant was one toward which the testator's mind was directed; or that with great earnestness, and of choice, his mind fixed its view on appellant, when he executed his will? Yet this must be done before appellant can be included in the word thus used. Such reasoning is seems to me is paradoxical. To go entirely outside of the meaning of the word "children", and against the unmistakable evidence of the intention of the testator, as expressed by the general terms and provisions of his will, it appears to me that there is neither reason nor legal precedent by which the court can single out a detached and isolated word, or provision, and by that declare that because the testator used the word "children" he meant to go outside of the class of persons he uni-

formly embraced in all the other provisions of his will, and thereby include and place upon an equality with such class, who were all of his own blood, a person who was without kinship, and the offspring of strangers.  If I have a fair conception of the law relative to the construction of wills, the construction which my associates have given to the will under consideration is indefensible.

In *Edgerly* v. *Barker*, 66 N. H. 434, 28 L. R. A. 328, the court on page 449 used the following language:  "Correct construction is not insured by correct views of the law. A testator's right to use the words in the sense in which they are commonly understood may be infringed when that sense is not known to his judicial interpreters, or is disparaged by their educational bias.  The professional and official sense sometimes introduced by construction is in effect a scholastic dialect not used by the mass of the people."  As I showed in my former opinion, the intention of the testator, as gathered from the will itself, when the will is read in the light of the circumstances and environments at the time of its execution, is in the last analysis and in every instance the objective point of judicial inquiry.  The law will not deny to the reader of an instrument the same light that the writer had.  In view of this rule, the inquiry naturally suggests itself, what did the word "children" mean to John Miles, when he signed the will?  I have no doubt, in the light of the whole will, and the circumstances and environments that surrounded him, that it meant to him just what the ordinary man understands it to mean, and, as used by him, it meant the natural offspring of his children.  It certainly did not mean to him artificial children.  We can not presume that he employed the word in any technical or professional sense. There is an expression in the Bible to the effect that the sins of the father shall be visited upon the "children's children to the third and fourth generations."  If we construe the word in the light of the prevailing opinion, then the sins of John Miles are to be visited upon the adopted child

of his daughter and upon her children's children. The clause of the will that has given rise to the contention here is itself explanatory of what the intention of the testator was. It is: "And in the event of the death of any of the last above named [meaning Thomas, John, and Samuel Miles, and Martha Walker, his only sons and daughter], the shares due such as may be deceased shall go to the children of such deceased person, if there be children, and if there be no children then such share shall go to the survivors." The words which precede those I have just quoted show a distinct and emphatic purpose of the testator to keep his property in the line of his own blood. Without extended comment, I refer to some authorities to show that the word "children" means natural offspring. Jarman on Wills, Vol. 2, p. 690; 2 Redfield on Wills, p..15. In Williams on Executors, Vol. 2, p. 362, in a note, it is said: "Neither does the word 'children' embrace a child adopted under a statute providing for such adoption." See, also, *Russell* v. *Russell*, 84 Ala. 48, 3 South. 900. Neither are stepchildren included in the word children. *Barnes* v. *Greenzebach*, 1 Edw. Chan. 41. Beach on Wills, §279, says: "A gift to children, if there be children in existence, does not include grandchildren nor stepchildren nor adopted children." See, also, *Douglas* v. *James*, 66 Vt. 21, 28 Atl. 319, where it is said: "We recognize the rule that in construing wills, the word 'children' is deemed to have been used in its popular sense, that is, as signifying descendants of the first degree." In *Ward* v. *Cooper*, 69 Miss. 789, 13 South. 827, a devise was made "to the children of my sister." The court said: "Only the immediate offspring of Barthenia Guinn were entitled to take under the will, since the gift is to 'children', and a broader than the primary signification of the word is not given to it by the will." Her children were the class designated to take by the will. Also, see, *Wylie* v. *Lockwood*, 86 N. Y. 291, to the same effect. *Cummings* v. *Plummer*, 94 Ind. 403, 48 Am. Rep. 167, which I cited in my former

opinion, is directly in point. While many additional author-ities in line with the above, and in harmony with those cited before, might be cited, it seems unnecessary to do so.

When we consider the meaning of the word "children" to be natural offspring, as fixed by law writers and judges of great learning, and as used by the sages of the law for cen-turies, it does not appear to me that when John Miles, who was ignorant of the law and unversed in its technicalities, but who used the word as he understood it, and in its primary, usual, and ordinary sense, such meaning as he gave it should be allowed to stand, and that his intention, as expressed by his will, ought not to be subverted by a forced and technical construction.

Appellees' reasons for a rehearing are, in my judgment, well taken, and the petition should be granted.