## Yates's Estate.

*Wills—Parol evidence—Latent ambiguity—"Child or children"—Adopted children.*

1. Parol evidence to show the circumstances of the adoption of the claimant and the maintenance of the family relationship with the testator, by whom she was treated as a niece, is inadmissible to enable her to take under a gift to "such child or children" as the adoptive parent may leave her surviving, as such evidence does not remove a latent ambiguity, but rather creates an ambiguity in the meaning of the words "child or children," which does not exist in the language of the will itself.

THOMPSON, J., dissents.

*Wills—Construction—Principal and income—Accrued income.*

2. A direction in the will that the trustee is, "immediately upon the death of" the life-tenant, "to pay, transfer and set over the principal of said share, together with any accrued income," to the remainderman, is given its full import when applied to income accruing after the death of the life-tenant and before actual distribution; it does not extinguish the life-tenant's right to income remaining in the hands of the trustee at her death or not yet received by him.

Exceptions to adjudication. O. C. Phila. Co., Oct. T., 1901, No. 163.

The facts appear from the following extract from the adjudication of the auditing judge (Thompson, J.) :

"This trust arose under the will of testator, whereby he gave one-fourth of the residue of his estate to his executors as trustees for the use and benefit of his sister, Helen M. Foulke, to pay the net income to be derived therefrom to her during life, without power of anticipation or assignment, and at and immediately upon her death to pay, transfer and set over the principal of said share, 'together with any accrued income, to such child or children as my said sister Helen M. Foulke may leave her surviving,' issue of any deceased child or children to take the parent's share; but should his said sister die without leaving any child or children, or the issue of any child or children deceased her surviving, then to pay, transfer and set over the principal and any accrued income to and among his nephew, George W. Foulke, and his nieces, Margaret G. (now Supplee) and Anna P. Foulke (now Grubb), the survivors or survivor of them, in equal shares in fee, and appointed his brother, Thaddeus N. Yates, and his friends, Amos R. Little and Henry S. Cattell, executors and trustees. The testator died Aug. 11, 1900, and the will is dated June 9, 1900.

"Amos R. Little and Henry S. Cattell are deceased. The account is filed by Thaddeus N. Yates, the surviving trustee, because the trust is now at an end by reason of the death of the *cestui que trust*, Helen M. Foulke, who died Oct. 2, 1923. She left a will, upon which letters testamentary isued to Effie Rebanda Foulke.

"Testator's sister, Helen M. Foulke, the *cestui que trust*, died without issue; but by deed dated Feb. 14, 1880, and duly recorded, she and her husband, Thomas H. Foulke, adopted a child of William and Ann Johnston, and covenanted that said child should be called Effie Rebanda Foulke and be treated by them as their own child and as though she had been born to them from wedlock.

"At the audit, Mr. Donoghue claimed the principal for and on behalf of said Effie Rebanda Foulke as the person contemplated by the testator in providing for the child of Helen M. Foulke; and Mr. Gourley, on behalf of testator's nephew, George W. Foulke, and his nieces, Margaret G. Supplee and Anna P. Grubb, claimed the fund under the substitutionary provision, to take effect

upon the death of testator's sister without leaving child or children surviving her.

"Mr. Donoghue offered in evidence the deed of adoption referred to, and proposed to produce testimony as to the history of the case—the family, and generally the circumstances and environments of testator at the time he made his will—for the purpose of showing whom testator intended to comprehend by the description 'child or children' of his sister Helen. This was objected to by Mr. Gourley as incompetent and inadmissible to affect the plain language of the will. Testimony, however, was taken, subject to objection and exception.

"It is true, as said by Penrose, J., in Pearson's Estate, 10 Dist. R. 189, that 'where the words are clear and free from ambiguity, and the external circumstances do not create any doubt or difficulty as to their proper application to the objects or the subject to which the instrument relates, no interpretation contrary to such plain meaning is permitted.' But the word 'child' or 'children' is not a word of art (Smith v. Chapman, Va., 1 Hen. & M. 240) or of plain and certain meaning. Strictly speaking, it does mean immediate, legitimate offspring; but in wills it may mean grandchildren (Burk's Estate, 21 Dist. R. 357; Tomlinson's Estate, 23 Dist. R. 347, 61 Pa. Superior Ct. 23; Campbell's Estate, 202 Pa. 459), or illegitimate children, as in the will of a bachelor giving his estate to his children (Clifton v. Goodbun, L. R., 6 Eq. 278; Elliott v. Elliott, 117 Ind. 380), and so even where the bequest is to the children of testator's sister (Howell v. Tyler, 91 N. C. 207; Sullivan v. Parker, 113 N. C. 301), or children adopted prior to the making of the will, where the testator knew of the adoption (Bray v. Miles, 23 Ind. App. 432); and even a stranger, taken by the testator into his family at an early age, not adopted, but treated in all respects as if his child, and called by his name, for thirty-six years, although the 'child' had married and left testator's house several years before the will was written, was held by Penrose, J., in Gibson's Estate, No. 441, January Term, 1907, as intended by the testator to be included in the direction of a holographic will that his property 'be sold and divided among you five children,' and the testator at the time of his death had only four living children, but grandchildren, children of a deceased son.

"In a note to Van Matre v. Sankey, 39 Am. St. Reps. (Ill.) 196 (226), it is said: 'Very often in wills property is devised to a specific person, and after his death to his heirs or next of kin, or to his heirs-at-law, and then, in the event of his having an adopted child, the question is whether such child is included within those words, and, therefore, entitled to the benefit of the devise or bequest. In the absence of circumstances tending to show that the testator anticipated the adoption, or knew that it had already taken place, and, therefore, probably intended to treat the person adopted as a possible beneficiary, the decisions generally exclude the adopted child from the benefit of the will: Jenkins v. Jenkins, 64 N. H. 407; Schafer v. Eneu, 54 Pa. 304; Wyeth v. Stone, 144 Mass. 441; Morrison v. Sessions, 70 Mich. 297; Reinders v. Koppelman, 94 Mo. 338.'

"In our own cases, Schafer v. Eneu, 54 Pa. 304; Bealor's Estate, 23 Dist. R. 1117, and Puterbaugh's Estate, 261 Pa. 235, the adoption had taken place after the death of the testator. In the latter case the court below had made an award to a child adopted four years after the death of the testator, and Mr. Justice Stewart, for the Supreme Court, reversing the award, says that there was nothing 'to be found in the will that, so far as testator knew, the adoption of a child was even contemplated,' and that 'not a single extrinsic fact can be pointed to as indicating that the testator intended that any one

4 D. & C.

not of his blood should share in his bounty. . . . It is not a question of the right of an adopted child to inherit, but simply a question of the testator's intention with respect to those who are to share in his estate.' And he states the question in such a case to be, 'Whom did the testator understand to be comprehended within the words children as he here employed them?'

"And as the auditing judge understands the present case, this is the question here. As, in order to construe a will, as held by a long line of cases (Postlethwaite's Appeal, 68 Pa. 477; Follweiler's Appeal, 102 Pa. 581; Webb v. Hitchins, 105 Pa. 91; Hermann's Estate, 220 Pa. 52; Shaffer's Estate, 262 Pa. 15), we must put ourselves in the testator's place, the auditing judge follows Gibson's Estate, No. 441, January Term, 1907, and overrules the objection."

The auditing judge, after making a summary statement of the testimony, found the facts as follows:

"From the testimony offered, it is clear that the testator knew at the time he made his will that his sister Helen never had any children by birth, and that the claimant, Effie Rebanda Foulke, had been adopted by her and her husband; that he knew that his sister's husband had died, and that she remained a widow; and, having been born in 1839, and his sister in 1844, he must have known, when he made his will, that she was upwards of fifty-five years of age and past the child-bearing period. It is clear, too, that the claimant lived with her adopting parents and in the family of testator's parents as actual children do, without any question or suspicion on her part that her relation to them was in any way unusual or peculiar. Certainly testator never told the claimant that she was not actually the daughter of his sister Helen, but, from responding to her addressing him as Uncle David, and by the gifts he made her as Uncle David, he encouraged the assumption that he was in fact her uncle. Taking all this into consideration, together with testator's introductions of his sister and the claimant as 'my sister Helen and her daughter,' and his conversations with Mrs. Curtis, in which he referred to her as a 'good and faithful daughter to that mother,' the auditing judge can come to no other conclusion than that, from his long and intimate relations with his sister and the claimant, the testator had come to look upon them as mother and child; and that, when he wrote his will and gave absolutely the portion of his estate bequeathed for the benefit of his sister during her lifetime to 'her child,' he actually meant to describe the claimant.

"Having the claimant in mind, the gift over, should his sister leave no child or children or their issue, is just as natural as in the case of his other sisters, for death without leaving child, children or their issue was a possibility in any case. To the suggestion that if testator had meant the claimant by the description 'child,' he would have referred to her by name, as he did in mentioning the nephew and nieces who were to take the gift over, the answer is that neither in the gift over of the absolute bequest to his brother, nor of the shares given for the benefit of his other sisters, did he name the persons he desired to take except by a like description as in the present case, and that it was only in relation to the present share that he named his nephew and two nieces, obviously not intending all his nephews and nieces to take any part therein. That the testator, knowing that his sister had no child by nature, was a widow and upwards of fifty-five years of age, should contemplate a future marriage and birth of child or children seems to the auditing judge a possibility too remote to be entertained by a mind acquainted with practical men in the practical affairs of life.

Yates's Estate.

"Another fact appears from an examination of the record in this estate which, while it may not be controlling, is of some significance to the mind of the auditing judge. Attached to the adjudication upon the first account of the trustees, filed after the death of Amos R. Little, and while all the sisters of testator were still living, by Thaddeus N. Yates and Henry S. Cattell, and in which the latter appeared as one of the counsel for all parties, is a writing dated Dec. 21, 1914, addressed to the surviving trustees by 'the undersigned, being the only persons interested in said estate, either as present beneficiaries (life interest) or as remaindermen,' approving the account; and 'the undersigned' are Eliza M. O'Connor, Clara T. Foulke, Helen M. Foulke 'cestui que trustent for life,' and Harry O'Connor, George W. Foulke, Margaret G. Supplee, Anna P. Grubb, Effie R. Foulke, 'remaindermen.'

"The claim of Effie R. Foulke is sustained.

"Questions were also raised as to what constitutes principal and what is income, and to the proper apportionment of income between cestui que trust and remaindermen. . . .

"As to what is principal and what income: It appears from the testimony that on Nov. 30, 1900, shortly after testator's death, the book value of the shares of the W. J. McCahan Sugar Refining Company was $205.24, and on Nov. 30, 1920, when the company went into liquidation, the book value was $685.49, or an increase of $480.25 per share, wholly from surplus earnings of the company; and that the income from Nov. 30, 1920, to Nov. 30, 1923, wholly from securities owned by the company, the income was $804,627.59, or $40.13 per share. The distributions to this estate, as shown by the account, from the assets of the company (including distribution of shares of preferred stock sold by the accountant), amount to $25,482.52, or $772.20 per share. Of these distributions, Mr. Donoghue claimed as properly income to which the cestui que trust is entitled, $520.48 per share, or $17,172.54—$40.13 per share income from investments from Nov. 30, 1920, to Nov. 30, 1923; and $480.25 per share, difference between $685.49, value per share at the time of liquidation, and $205.24, value at about the time of testator's death.

"Under the principles laid down in Stokes's Estate, 240 Pa. 277; Sloan's Estate, 258 Pa. 368, McKeown's Estate, 263 Pa. 78, this is income of the estate, and will accordingly be transferred from principal to income account.

"As to apportionment of income between cestui que trust and remaindermen: Under the direction to pay the net income to the cestui during life, she acquired a vested right to income of the estate as it accrued from day to day between testator's death and her own, the only qualification of her right being as to alienation and anticipation. It is urged, however, that this right is extinguished as to income remaining in the hands of the trustee at her death or not yet received by him. Every man is presumed to know the law and to intend to act accordingly; and in the construction of this will it must be assumed that testator knew and had in mind that the trustee was entitled to have his account approved and the fund awarded by the court before he could distribute with safety. The word 'immediately,' therefore, evidently does not mean 'instantly,' but is used in its etymological sense of 'not mediately,' that is, without conversion of the assets into cash. With this in mind, the words 'accrued income' are given their full import when applied to income accruing after the death of the cestui que trust and before actual distribution. The trustee, in whatever form the assets of the estate may be, is 'immediately upon the death of my said sister Helen M. Foulke, to pay, transfer and set over the principal of said share, together with any accrued income,'

4 D. & C.

to the remaindermen. The will thus merely in terms enjoins the application of the general rule of apportioning income between *cestui que trust* and remaindermen where no particular direction is given, and without by implication taking away from the *cestui que trust* what had theretofore been given to her.

"In Henson's Estate, 13 Dist. R. 288, where the direction was to pay over income only as 'received,' it was held by this court that 'all that this word 'received' was intended to mean was that the trustee was only to pay to the widow the income as received, and not that she was not to be considered as the owner thereof as it accrued and fell due, and whether in the hands of the trustee or not.' Of course, where, as in Antelo's Estate, 24 Dist. R. 181, the direction was that all income 'in hand and accrued' to the date of 'the death· of the *cestui que trust*, but not paid over,' should go to the remaindermen, such direction will be carried out. No such restriction of the right of the *cestui que trust* here to all the income accrued to the estate between the death of testator and her own appears in this will, and, therefore, the income will be apportioned and awarded in the usual way."

*Harvey Gourley*, for exceptants; *Daniel C. Donoghue*, contra.

GEST, J., April 2, 1924.—The testator executed his will on June 9, 1900, and died on Aug. 11th of the same year. By his will he divided his residuary estate into four equal parts. One he gave to his brother Thaddeus, if the latter survived, or to his issue, if he should be deceased, and in default of issue to the testator's three sisters. The other three shares the testator gave in trust for the benefit of his three sisters, Eliza, Clara and Helen, under similar trusts, viz., as to Helen Foulk, in trust to pay her the income for life and on her death to pay over the principal of her share "to such child or children as my said sister Helen may leave her surviving and the issue of any child or children who may be deceased in equal shares *per stirpes*," with remainder over, in default of such issue, to his nephew and two nieces, who are the exceptants here. The trusts for Eliza and Clara are identical, except that the remainders over in default of children or issue are given to the testator's surviving brother and sisters.

Helen Foulk, at the time of the execution of the will, was fifty-six years old and married to Thomas Foulk, but had no children. She died on Oct. 2, 1923, without ever having had children born of her body, but on Feb. 14, 1880, adopted the claimant, Effie Foulk, who was then an infant and was the daughter of William Johnston, deceased, and his wife, Anne Johnston. The testimony showed that Effie had been brought up by Thomas and Helen Foulk as their daughter, and under the name of Effie Rebanda Foulk; that the fact of her adoption was known to the testator when he made his will some ten years afterwards, and that he was called by her uncle Dave, etc. The auditing judge awarded the trust estate to Effie as the child of Helen, and the testator's nephew and nieces have filed these exceptions.

The first matter to be considered is the status of Effie as the adopted child of Helen under the deed of Feb. 14, 1880. The Act of May 4, 1855, § 7, P. L. 431, then in force, providing for adoption by decree of court, distinctly provides for the right of inheritance by the adopted child, and gives the adopted child the rights of a child and heir of the adoptive parents: Johnson's Appeal, 88 Pa. 346. But, nevertheless, the collateral inheritance act was held to apply, in Com. *v.* Nancrede, 32 Pa. 389, because, as the Supreme Court said, "giving an adopted son a right to inherit does not make him a son in fact:" Wayne's Estate, 18 W. N. C. 10. And likewise the adoption of a child by the

testator himself after the execution of his will does not operate (previous to the Act of May 20, 1921, P. L. 937) as a revocation of the will *pro tanto:* Boyd's Estate, 270 Pa. 504. The parties, however, did not avail themselves of the provisions of the Act of 1855, but adopted the claimant under the supplementary Act of April 2, 1872, P. L. 31, which refers to the common law form of adopting a child by deed and makes a certified copy of the recorded deed admissible in evidence; but, as was pointed out in Ballard *v.* Ward, 89 Pa. 358, and McCully's Estate, 8 W. N. C. 14, affirmed in 10 W. N. C. 80, there is no such thing in Pennsylvania as a common law adoption by deed or in fact a common law adoption at all.

. Now, the deed of adoption in this case recites that Thomas and Helen Foulk are desirous of adopting the female child of Anne Johnston and taking her to live with them, to be cared for and educated as their own daughter, and that Anne Johnston consented and approved of such adoption, and the deed proceeds with a covenant by Anne Johnston to transfer and assign the said child to said Thomas and Helen Foulk, to have and to hold as their daughter and adopted child, and provided that they should treat the said child as their own and as though the same was born to them in lawful wedlock, and Thomas and Helen Foulk on their part agreed to treat the child kindly and as a daughter, to train, rear and teach her correct principles of morality and of the Christian religion and to keep, maintain and educate her according to their ability, so as to make her a useful member of society, and to train her to habits of industry and good order. There is not a word in this indenture to give the claimant any right of inheritance in the estate of her adoptive parents, such as is expressly given in cases of adoption under the Act of 1855, and it is very probable that the adoptive parents elected for this reason to have recourse to the Act of 1872. As was said by Judge Penrose in McCann's Estate, 9 Dist. R. 184, in speaking of McCully's Estate, 8 W. N. C. 14, the paper was prepared "with no intention of conferring the right to inherit as a consequence of the so-called adoption." See, also, the similar cases of Wallace's Estate, 218 Pa. 39, and Carroll's Estate, 219 Pa. 440.

It follows from this that Effie Foulk could not inherit as a statutory child and heir of her adoptive parents, but the auditing judge was of opinion that she could take under the will of the testator as included in the designation of child or children of Helen, relying principally upon the case of Bray *v.* Miles, 23 Ind. App. 432. In this case the testator gave his estate to his children, with a substitutionary gift, in the event of the death of any one of them, to the children of such deceased person. One of his daughters, Martha, was married when the will was written, never had children and predeceased the testator, having, however, during her lifetime, legally adopted a child, to whom Martha's share was awarded, upon the ground that, under the statute of Indiana regulating adoption, the adoptive parents occupied the same position to an adopted child as natural parents, and, therefore, the adopted child was identified as a beneficiary under the will. A dissenting opinion was filed by the Chief Justice, which drew a clear distinction between the rights of an adopted child to inherit from its adoptive parents as though it were their child and the fact that adopting a child does not make it in reality the child of the adoptive parents, citing our own case of Schafer *v.* Eneu, 54 Pa. 304, where it is stated that the act of assembly does not attempt an impossibility; in other words, the identity of the child is not changed. But even if the decision in Bray *v.* Miles should be considered as sound, it is not applicable, as in that case the child had been legally adopted under the statute of Indiana, which provided that the adopted child should be entitled to all the rights in

4 D. & C.

the estate of the adopting father or mother, by descent or otherwise, that such child would have if the natural heir of such adoptive father and mother.

The auditing judge was, however, of opinion that the testator understood Effie, the claimant, to be comprehended within the word "children" as he employed it in his will, and to some extent relied upon an unreported adjudication of Judge Penrose in the Estate of Samuel Gibson, 441 of January, 1907, which, as no exceptions were filed to it, was never considered by the court *in banc*. The will in this case provided: "If anything happens to me, all my property is to be sold and divided among you five children, share and share alike." As the testator left four children, it it easy to see that there was something in the will that afforded a basis for testimony to show whom he intended by the fifth. No exceptions were filed, and it appears from the orders to satisfy that the four children made no objection to the award to the person to whom the testator stood *in loco parentis*, as his signature is followed by those of the other four.

It is true that in Schafer *v.* Eneu, 54 Pa. 304, and Puterbaugh's Estate, 261 Pa. 235, the adoption took place after the testator's death, so that these decisions do not rule this case, but it may be observed that in Puterbaugh's Estate the Supreme Court referred to "the disposition of the courts to confine and limit the word children in its application, when it occurs in a will, to its natural import, except where the testator has clearly shown by other words that he intended to use the term in a more extensive sense." In Hughes's Estate, 225 Pa. 79, the testator directed that his money in bank should be divided among all his children, and this was held not to include a woman whom, as an infant sixteen months old, the testator had taken to raise, and whom he recognized and treated as a daughter for thirty-five years, and to whom in his will he devised other property, describing her as "my adopted daughter" and "my daughter Annie Griffiths." We may also refer to Line's Estate, 221 Pa. 374, and our own decision in Bringhurst's Estate, 1 D. & C. 330, in which parol evidence was held inadmissible to show that the testator considered a child, whom his daughter had adopted, as though she were a member of her family and his own grandchild. We there said: "Parol evidence is competent only to explain ambiguities in the will or to apply its provisions to the subject or person intended when the description is defective, uncertain or too general to be understood; but when the language of the will is plain, as it is here, parol evidence is not admissible in order, first, to create the ambiguity, and then afterwards to remove it. Evidence intended to afford a light by which what is said in the will may be read and understood is proper and competent, but that is quite different from evidence whose effect is to introduce into a will that which is foreign to it, thus giving to it operative provisions which were not in it before." We believe that this statement of the law conforms with the rulings of the Supreme Court, and that, therefore, the parol testimony should not have been received in this case.

There are indeed numerous cases, some of which were cited, in which the courts have construed the words child or children to include grandchildren, and perhaps Campbell's Estate, 202 Pa. 459, is the extreme case. There, Judge Penrose, in this court, held that the gift in remainder to the children of the life-tenant was vested, and awarded the share in controversy to the executrix of the deceased son and not to his children. And in the course of his adjudication Judge Penrose said significantly: "If a grandchild claims a share of the estate of his grandfather under a gift to 'children,' he must show beyond all possible doubt that the word was used in a sense other than its usual one—as the equivalent of progeny or issue. . . . The word 'child,'

according to the lexicographers, means a son or daughter, the immediate progeny of the parent, but the word 'children' in the plural may mean 'the descendants of a man, however remote,'" citing authorities. Exceptions were dismissed in an opinion by Hanna, P. J., 10 Dist. R. 287. On appeal, the Supreme Court discovered a manifest general intent in the will "to send the shares of each of his daughters respectively down in the line of *his and her blood* (italics ours) *per stirpes*. If he had said 'decease without leaving any issue surviving,' it would have been beyond question, and the plain intent of the whole provision of his will shows that he used the word 'children' in the sense of issue; a sense which, as remarked by the learned auditing judge, is sanctioned by the lexicographers," etc. In other words, this case was decided on the ground that "children" meant issue, a conclusion that would not help the adopted child in this case, for certainly an adopted child is in no sense the issue. We refer also to Judge Penrose's comments on Campbell's Estate in Page's Estate, 227 Pa. 288, and also to McGlensey's Estate, 37 Pa. Superior Ct. 514. And, furthermore, as was said in Puterbaugh's Estate, 261 Pa. 235, it requires less strain to include grandchildren under a gift to children than it does to enlarge the words so as to include adopted children, the obvious reason being that "children" may mean descendants, however remote.

While decisions in other states are, of course, not authoritative, we may refer to Woodcock's Appeal, 103 Me. 214, and Lichter *v.* Thiers, 139 Wis. 481. Re Truman, 61 Atl. Repr. 598 (R. I.), is cited to the contrary, but it will be noted that in this case the child had been adopted under the statute which gave her all the rights of inheritance as if she had been born the lawful child of her adoptive parents.

Nor do we attach importance to the fact that the testator, knowing his sister's age, took it for granted that she could bear no children, and he, therefore, must have intended her adopted child as a beneficiary. This theory of decision is open to the same objection, namely, that there is nothing in the will to serve as a basis for it, and, although the probability of a woman fifty-six years old having a child is exceedingly remote, yet it is not impossible, and, in proper cases, where we terminate trusts on this ground, we always exact at least a refunding bond or receipt. We have no right to assume that the testator was familiar with the physiological statistics on this subject, and, while he may not have instructed the scrivener of the will as to the adoption of the claimant by his sister, or perhaps may have taken it for granted that an adopted child would take under the general designation of children, all this is mere surmise, affording no basis for a judicial construction of the will.

The terms of this trust for Helen's share of the estate, it will be noted, are precisely similar to those of the trusts for the two other sisters, and it may, therefore, be assumed that his intention was uniform in all three cases.

If the claimant in this case had been adopted under the Act of 1855, or possibly under a deed giving her the right of inheritance, and the testator had died on or after Dec. 31, 1917, the statutory canon of construction enacted in section 16 *(b)* of the Wills Act of 1917 would apply, by which this bequest to the children of the testator's sister would be construed to include her adopted child, who was adopted before the date of the will, an intention to the contrary not appearing therein. But the case is governed by the law as it existed prior to this statute.

For the reasons set forth, the exceptions 1, 2, 3 and 4 are sustained.

Exceptions were also filed to the award by the auditing judge to the executor of the deceased life-tenant of the income of the estate, inasmuch as the

4 D. & C.

will directed, on the death of the life-tenant, that the principal, together with any accrued income, should be paid to the remainderman. We agree with the auditing judge in this respect, and, therefore, exceptions 5, 6 and 7 are dismissed.

Counsel will prepare a schedule of distribution in accordance with this opinion and submit the same to the auditing judge for his approval.

THOMPSON, J., dissents for the reasons expressed in his adjudication.